UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION

HARVEY SILVERMAN and
SILVERMAN PARTNERS, L.P.,

       Plaintiffs,

vs.

ARTHUR FALCONE, et al.,

       Defendants.

_____/

## **COMPLAINT**

Plaintiffs, Harvey Silverman and Silverman Partners, L.P., sue Defendants, Arthur Falcone, Falcone Group, LLC, Falcon Commercial Development, LLC, Falcon Park West, LLC, Falcon Park West II, LLC (these four entities are collectively referred to as the "Primary Falcone Entities"), Miami First, LLC, Miami Second, LLC, Miami Third, LLC, Miami Worldcenter Holdings LLC (these four entities are collectively referred to as the "Secondary Falcone Entities"), MR 44 MGR LLC, PWV Group 1 Holdings, LLC, Park West Ventures, LLC, PWV Member, LLC, Miami A/I, LLC, and Centurion Partners PW Investors, LLC ("Centurion") (collectively, all Defendant entities are referred to as the "LLC Defendants") (Plaintiffs and Defendants are collectively referred to as the "Parties"), and allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs' claims are founded on Falcone's fraudulent transfers, breach of contract, breach of fiduciary duty, self-dealing, and disregard of Plaintiffs' rights in violation of Florida law, all in connection with a much publicized real estate development project in Miami, Florida, which is known as the Miami Worldcenter.

2.      This is an action for (a) damages to be determined at trial but no less than $50 million, exclusive of interest, costs, and attorneys' fees, (b) declaratory relief pursuant to Chapter 86, Florida Statutes, arising out of a joint venture agreement between and/or among the parties, and (c) declaratory relief relating to Plaintiffs' rights to receive equity interests from certain Defendants, arising out of Falcone's fraudulent transfers, breach of fiduciary duty, and fraudulent conveyances, and related actions of the other Defendants, all of which are within the subject matter jurisdiction of this Court.

3.      The factual basis for this lawsuit is that Falcone, individually and/or through the Primary Falcone Entities, breached fiduciary obligations owed to Plaintiffs, as legal and beneficial co-owners and members, and pursuant to executed operating agreements of various LLCs of which Falcone and/or the Primary Falcone Entities was, were, or are the sole or co-manager. Additionally, Falcone fraudulently conveyed Miami Worldcenter properties owned by the LLCs to Secondary Falcone Entities and/or third party investors in which Falcone has a legal and/or beneficial interest, thereby depriving Plaintiffs of their ownership interests, invested capital, and return on their capital contributions.

2

## JURISDICTION AND VENUE

4.      This Court has diversity subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) as the amount in controversy exceeds $75,000, exclusive of interests and costs, and this matter is between citizens of different states.

5.      Venue is proper in this case pursuant to 28 U.S.C. § 1391 as the causes of action alleged herein accrued in this judicial district and the real property which is the subject of this lawsuit is located within this judicial district. Additionally, the governing written agreement's venue provision provides that "[t]he parties hereto agree to submit to the jurisdiction of the federal or state courts sitting in Palm Beach County, Florida . . . and stipulate that venue for such actions shall be solely in Palm Beach County, Florida."

## PARTIES

6.      Plaintiff Harvey Silverman is an individual residing in New York and is and at all times relevant hereto was a member and/or interest holder of the entities described herein, is over 18 years of age, and is otherwise *sui juris*.

7.      Plaintiff Silverman Partners, L.P. is a limited partnership organized and existing under the laws of Delaware with its principal place of business in New York. Each partner of Silverman Partners, L.P. is a citizen of New York. Silverman is the general partner of Silverman Partners, L.P.

8.      Defendant Arthur Falcone is an individual residing in Palm Beach County, Florida, is over 18 years of age, is otherwise *sui juris*, and is subject to the personal jurisdiction of this Court.

9.      Defendant Falcone Group, LLC is a limited liability company organized and existing under the laws of Florida with its principal place of business in Palm Beach County,

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

Florida, and subject to the personal jurisdiction of this Court. The members of Falcone Group, LLC are each citizens of Florida. Falcone is the manager of Falcone Group, LLC.

10.     Defendant Falcon Commercial Development, LLC is a limited liability company organized and existing under the laws of Florida with its principal place of business in Palm Beach County, Florida, and is subject to the personal jurisdiction of this Court. Falcone, a citizen of Florida, is the sole member and manager of Falcon Commercial Development, LLC.

11.     Defendant Falcon Park West, LLC is a limited liability company organized and existing under the laws of Florida with its principal place of business in Palm Beach County, Florida, and is subject to the personal jurisdiction of this Court. The members of Falcon Park West, LLC are each citizens of Florida. Falcone, a citizen of Florida, is the managing partner of Falcon Park West, LLC.

12.     Defendant Falcon Park West II, LLC is a limited liability company organized and existing under the laws of Florida with its principal place of business in Palm Beach County, Florida, and is subject to the personal jurisdiction of this Court. Falcone, a citizen of Florida, is the sole member and manager of Falcon Park West II, LLC.

13.     Defendant Miami First, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Palm Beach County, Florida. Miami First, LLC is subject to the personal jurisdiction of this Court based upon its ownership of property and transacting of business, and otherwise engaging in conduct in Florida. The members of Miami First, LLC are not citizens of New York. Miami Worldcenter Holdings LLC is the manager of Miami First, LLC.

14.     Defendant Miami Second, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Palm Beach County,

4

Florida. Miami Second, LLC is subject to the personal jurisdiction of this Court based upon its ownership of property and transacting of business, and otherwise engaging in conduct in Florida. The members of Miami Second, LLC are not citizens of New York. Miami Worldcenter Holdings LLC is the manager of Miami Second, LLC.

15.    Defendant Miami Third, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Palm Beach County, Florida. Miami Third, LLC is subject to the personal jurisdiction of this Court based upon its ownership of property and transacting of business, and otherwise engaging in conduct in Florida. The members of Miami Third, LLC are not citizens of New York. Miami Worldcenter Holdings LLC is the manager of Miami Third, LLC.

16.    Defendant Miami Worldcenter Holdings LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Palm Beach County, Florida. Miami Worldcenter Holdings LLC is subject to the personal jurisdiction of this Court based upon its ownership of property and transacting of business, and otherwise engaging in conduct in Florida. The members of Miami Worldcenter Holdings LLC are not citizens of New York.

17.    Defendant MR 44 MGR LLC is a limited liability company organized and existing under the laws of Florida with its principal place of business in Palm Beach County, Florida. Falcone is the sole member and manager of MR 44 MGR LLC.

18.    Defendant PWV Group 1 Holdings, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Palm Beach County, Florida. PWV Group 1 Holdings, LLC is subject to the personal jurisdiction of this Court based upon its ownership of property and transacting of business, and otherwise engaging

5

in conduct in Florida. The members of PWV Group 1 Holdings, LLC are not citizens of New York. Park West Ventures, LLC is the managing member of PWV Group 1 Holdings, LLC.

19.     Defendant Park West Ventures, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Palm Beach County, Florida. Park West Ventures, LLC is subject to the personal jurisdiction of this Court based upon its ownership of property and transacting of business, and otherwise engaging in conduct in Florida. The members of Park West Ventures, LLC are not citizens of New York.

20.     Defendant PWV Member, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Palm Beach County, Florida. PWV Member, LLC is subject to the personal jurisdiction of this Court based upon its ownership of property and transacting of business, and otherwise engaging in conduct in Florida. The members of PWV Member, LLC are Florida limited liability companies whose members are citizens of Florida.

21.     Defendant Miami A/I, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Palm Beach County, Florida. Miami A/I, LLC is subject to the jurisdiction of this Court based upon its ownership of property and transacting of business, and otherwise engaging in conduct in Florida. The members of Miami A/I, LLC are not citizens of New York. Miami Worldcenter Holdings LLC is the Manager of Miami A/I, LLC.

22.     Defendant Centurion Partners PW Investors, LLC ("Centurion") is a limited liability company organized and existing under the laws of Delaware. Centurion is subject to the personal jurisdiction of this Court based upon its ownership of property and transacting of

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

business, and otherwise engaging in conduct in Florida. The members of Centurion are not citizens of New York.

## GENERAL ALLEGATIONS

### I.     Background

23.     In or around 2002, Marc Roberts, a Florida real estate investor and long-time friend of Silverman, contacted Silverman and proposed that they become partners in a variety of Florida joint venture projects.

24.     At that time, Roberts solicited money from Silverman and Silverman Partners, L.P. (collectively, the "Plaintiffs") and represented to Plaintiffs that the money would be used solely for the purpose of purchasing and developing certain real property projects (the "Projects").

25.     As Roberts was well aware, Silverman provided, among other things, a strong financial position and creditworthiness to obtain unsecured lines of credit to finance the Projects with a number of different banks.

### II.    The Miami Worldcenter Project

26.     In or around 2004, Roberts met with real estate developer Falcone regarding a new potential real estate deal – an urban redevelopment project involving approximately 25 acres in downtown Miami, Florida. This project, named by Falcone and commonly known as Miami Worldcenter ("Miami Worldcenter Project" or "Miami Worldcenter"), entailed the acquisition and assemblage of real property parcels in the area of Miami generally located north of NW/NE 5th Street, south of NW/NE 12th Street, west of Biscayne Boulevard, and east of NW 1st Avenue (the "Assemblage"), with some portions of the Assemblage lying in part beyond these general boundaries. The Assemblage is located within walking distance of downtown attractions

7

such as the Adrienne Arsht Center, Museum Park, American Airlines Arena, Bayside Marketplace, and Freedom Tower.

27.     The terms and intent of the Miami Worldcenter Project were for it to continue until all of the Assemblage, whether developed or undeveloped, was sold or otherwise disposed of. The real property acquisition costs alone were projected to exceed $300 million.

28.     As publicly described in expensive and extensively distributed promotional materials, the development plans for Miami Worldcenter did and continue to entail building a large scale, mixed-use development creating a blend of retail, restaurants, entertainment, hotel, residential, and commercial offerings.

29.     In furtherance of the Miami Worldcenter Project, Falcone, through his entity Falcon Park West, LLC, and Silverman, through Harcone 44B LLC, an entity in which he was a member, created Harcone 44, LLC.

30.     Pursuant to the terms of the Harcone 44B LLC Operating Agreement, Silverman Partners, L.P. owned and continues to own 48.625% shares of Harcone 44B LLC.

31.     Falcone and Silverman's joint venture, Harcone 44, LLC, was memorialized in an operating agreement. *See* Operating Agreement of Harcone 44, LLC, attached as Exhibit "A."

32.     Harcone 44, LLC was created for the purpose of acquiring and holding Miami Worldcenter properties.

33.     The beneficial and/or legal ownership of the Miami Worldcenter Project was to be held 50 percent by Silverman and Roberts together and 50 percent by Falcone through the Primary Falcone Entities.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

34.     For liability and other business purposes, Falcone and Roberts formed a separate LLC for each property that was acquired for the Miami Worldcenter Project (collectively, the "Miami Worldcenter Project LLCs").

35.     Roberts formed a sister LLC to correspond with each of the various Miami Worldcenter Project LLCs to hold the Roberts-Silverman shares. The Roberts-Silverman entities were often named after the property and followed by "44B."

36.     On March 2, 2010, Roberts filed a Chapter 7 bankruptcy petition, rendering him voluntarily bankrupt. As a result, Roberts forfeited his status as a member and/or beneficial owner of the entities that he formed with Falcone and Silverman for the property acquisitions.

37.     Between 2004 and 2009, Silverman and Falcone each invested approximately $40 million in the Miami Worldcenter joint real estate venture.

38.     Other LLCs were formed to take title to Falcone's and Silverman's shares of the various Miami Worldcenter Project LLCs. These entities include, but are not limited to, MR 44 MGR LLC, Miami Ingraham Properties 44 LLC, Miami Worldcenter Group LLC, Harcone 44, LLC, Harcone Acquisitions LLC, Harcone Acquisitions II LLC, and Harcone Holdings, LLC.

39.     MR 44 MGR LLC was 100% owned and member-managed by Roberts until his membership interest was transferred to Falcone. At the time Plaintiffs' claims arose, Falcone was the sole manager of MR 44 MGR LLC.

40.     Miami Worldcenter Group LLC was 100% owned and member-managed by Harcone 44, LLC.

41.     Harcone Acquisitions LLC was 100% owned and member-managed by Harcone 44, LLC.

9

42.     Harcone Acquisitions II LLC was 100% owned and member-managed by Harcone Acquisitions LLC.

43.     Harcone Holdings, LLC was owned at least 25% by Silverman Partners, L.P. through member entity Harcone 44B LLC, and 50% by Falcone through member entity Falcon Park West, LLC.

44.     Plaintiffs have been instrumental in funding the acquisition of real property to create and complete the Assemblage.

45.     Plaintiffs have contributed approximately $40 million in capital investment to the Miami Worldcenter Project in reliance on Falcone's representations that he was an experienced developer and project manager, and that he was a trustworthy partner.

**A.      Renegotiation of the Africa-Israel Deal to the Detriment of Plaintiffs**

46.     Within the Assemblage, Falcone decided that it was critical to the success of the Miami Worldcenter Project to acquire approximately 20 parcels of real property known as the "Africa Israel" properties (the "A/I Properties"), the largest bundle within the Miami Worldcenter Project.

47.     On May 9, 2006, 150 NE 7th LLC entered into a Purchase and Sale Agreement to purchase the A/I Properties at a purchase price of $88,711,288.00 (the "Initial A/I Agreement").

48.     150 NE 7th LLC was owned 100% by Harcone 44, LLC, which was owned 25% by Silverman Partners, L.P. through member Harcone 44B LLC, and 50% by Falcone through member Falcon Park West, LLC.

49.     Pursuant to the Initial A/I Agreement, 150 NE 7th LLC agreed to purchase the A/I Properties and to place certain deposits with the sellers.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

50.     $14 million of Plaintiffs' money was used towards the earnest money deposit on the Initial A/I Agreement.

51.     Subsequently, a dispute arose under the Initial A/I Agreement in which the sellers retained the deposit due to an alleged default by the purchasers.

52.     As a result, on January 30, 2009, 150 NE 7th LLC filed a lawsuit styled *150 NE 7th LLC v. Arena Garage, LLC, et al.*, Case No.: 09-07467 CA 02, against the sellers of the A/I Properties in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida.

53.     On or around July 8, 2009, Falcone informed Silverman that the deposits on the A/I Properties had been lost and asked Silverman to invest more capital, though Silverman had no such obligation.

54.     Pursuant to the terms of the 150 NE 7th LLC Operating Agreement, "no member [was] required to contribute additional capital," nor could company property be partitioned.

55.     Approximately one week later, Falcone informed Silverman in a letter dated July 14, 2009 that (i) the A/I Properties were being discounted to $39 million with the buyer receiving an $18 million credit towards the purchase price, (ii) new investors had been obtained, (iii) whatever interest to be retained by Falcone-Silverman would be pari-passu, and (iv) 150 NE 7th LLC would have the right to invest up to $2 million for a period of one year.

56.     Unbeknownst to Plaintiffs, 150 NE 7th LLC and the sellers of the A/I Properties negotiated a deal to resurrect the sales transaction with regard to the A/I Properties and credit 150 NE 7th LLC's deposits against the final sale price, which was less than half the original sale price.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

57.     Defendant Falcone asserted his control over 150 NE 7th LLC and engaged in a scheme to further deny Plaintiffs of their interests by ensuring that 150 NE 7th LLC, in which Plaintiffs had a 25% ownership interest, did not take title to the real property.

58.     To further effectuate that scheme, Falcone orchestrated an assignment of 150 NE 7th LLC's rights to purchase the A/I Properties to PWV Group 1 Holdings, LLC, another Falcone-related entity.

59.     PWV Group 1 Holdings, LLC subsequently purchased the A/I Properties for approximately $39 million, a purchase price approximately $50 million less than the original price (the "A/I Purchase").

60.     Falcone has an interest in PWV Group 1 Holdings, LLC, through his interest in PWV Member, LLC, which is a member of Park West Ventures, LLC, which is a member of PWV Group 1 Holdings, LLC.

61.     Pursuant to the terms of the PWV Member, LLC Operating Agreement, PWV Member, LLC was formed for the purpose of becoming a member of Park West Ventures, LLC and to negotiate and execute the purchase of the A/I Properties.

62.     Silverman Partners, L.P., as co-owner of Harcone 44B LLC, holds an economic interest in at least 2% of the profits, losses, and cash allocated or distributed to PWV Member, LLC, a significant unconsented reduction in Plaintiffs' ownership.

63.     To date, Plaintiffs have not received any profits or cash distributions from PWV Member, LLC.

64.     Despite multiple attempts between September and December 2009 by Plaintiffs' representatives to obtain draft documents for review and consideration regarding the A/I Purchase, negotiations of the terms were made without Plaintiffs' knowledge or consent.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

65.     The money contributed by Plaintiffs for the deposit under the Initial A/I Agreement was applied to and/or was consideration for the A/I Purchase.

66.     In a December 16, 2009 letter to Silverman, Falcone summarized the terms of the A/I Purchase, which resulted in a substantial dilution of pre-closing Roberts-Silverman ownership by the new equity investment and by the "promote" included for Falcone.

67.     Falcone intentionally withheld information in an effort to defraud and devalue and/or dissolve Plaintiffs' return on investment and interest in the Africa Israel transaction.

68.     On September 29, 2011, PWV Group 1 Holdings, LLC fraudulently conveyed the properties for a purchase price of $21 million by special warranty deed to Miami A/I, LLC. Falcone has an interest in Miami A/I, LLC.

69.     Miami A/I, LLC currently owns 27 parcels that are part of the Assemblage.

**B.     Bringing Centurion in to Assist in the Further Dilution of Plaintiffs' Interests**

70.     Without Plaintiffs' knowledge or consent, on November 12, 2008, MWC Ventures, LLC was formed and a limited liability agreement was executed by and between Harcone Holdings, LLC and Centurion for the continued "development, improvement, sales, maintenance, operation, management, and rental of the real property" that comprises the Miami Worldcenter Project.

71.     Without Plaintiffs' knowledge or consent, under the MWC Ventures, LLC Operating Agreement, Centurion contributed $3 million of capital contributions in return for 13.98% interest in the company.

72.     Without Plaintiffs' knowledge or consent, Falcone contributed 100% of Harcone Holdings, LLC's membership interests in Harcone 44, LLC, valued at $18,452,801, for an 86.02% interest in the company.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

73.    The purpose of bringing in Centurion and divesting Harcone Holdings, LLC of its interest in Harcone 44, LLC was to save the value of Falcone's interest in the properties through the cash infusion by Centurion. This was all to the detriment of Plaintiffs and in direct contravention of the Harcone 44, LLC Operating Agreement.

74.    Without Plaintiffs' knowledge or consent, and without compensating Plaintiffs, Falcone conspired with Centurion and others to dilute and devalue Plaintiffs' interests in Harcone 44, LLC by transferring Harcone 44, LLC's membership interest and selling approximately 14% of equity interest in the Miami Worldcenter Project to Centurion at a steep discount.

75.    Falcone intentionally undervalued the properties included in the valuation of initial capital contributions with the intent to dilute and devalue Plaintiffs' ownership interests.

76.    Centurion conspired with Falcone to dilute and devalue Plaintiffs' interests under the MWC Ventures, LLC Operating Agreement.

77.    MWC Ventures, LLC was cancelled in 2011.

78.    In the end, Falcone and Centurion benefited from the fraudulent transfer and retained an ownership in the A/I Properties to Plaintiffs' detriment.

**C.    Defaults on Loans Related to Key Assemblage Properties were Detrimental to Plaintiffs**

79.    In further devaluing and diluting Plaintiffs' interest in the Miami Worldcenter Project, as laid out in the Harcone 44, LLC Operating Agreement, Falcone permitted lending banks to foreclose on properties in which Plaintiffs had an interest.

**1.    Fifth Third Bank Foreclosures**

80.    On or about July 28, 2010, Fifth Third Bank ("Fifth Third") commenced a mortgage foreclosure lawsuit against the following entities, which at that time were managed and

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

controlled by Falcone: Park West 3, LLC, Park West 5, LLC, Miami Auction Prop LLC, 950 NE 2nd LLC, 915 N Miami LLC, 701 N Miami LLC, and 100 NE 11th LLC (the "Fifth Third Foreclosure").

81.     On or about October 20, 2010, Default Final Judgment of Foreclosure (Case No. 10-41120 CA 32) was entered in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, in the Fifth Third Foreclosure for the amount of $41,910,831.84 due and owing to Fifth Third (the "Fifth Third Judgment").

82.     Pursuant to the Fifth Third Judgment, a public foreclosure sale was scheduled for November 24, 2010 (the "Fifth Third Foreclosure Sale").

83.     Walnut and Vine Properties I, LLC, an affiliate of Fifth Third, purchased the properties at the Fifth Third Foreclosure Sale.

84.     On or about February 28, 2011, Miami First, LLC purchased 28 parcels of land, including those properties that were temporarily acquired by Walnut & Vine Properties I, LLC, at the Fifth Third Foreclosure Sale, for a total purchase price of $23,739,100.00.

85.     On December 16, 2010, Miami Auction Prop LLC conveyed by quitclaim deed 26 NE 7th Street, 601 N. Miami Avenue, and 25 NE 6th Street to Walnut and Vine Properties I, LLC. This was a voluntary conveyance, unilaterally orchestrated and authorized by Defendant Falcone and part of a negotiation with Fifth Third to circumvent the Fifth Third Foreclosure.

86.     Miami First, LLC, a Falcone-related entity, purchased 26 NE 7th Street, 601 N. Miami Avenue, and 25 NE 6th Street back from Walnut and Vine Properties I, LLC below fair market value.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

2. **Iberia Bank Foreclosures**

87.    On or about September 9, 2009, Orion Bank commenced a mortgage foreclosure lawsuit against the following entities, which at that time were managed and controlled by Falcone: 46 NE 10th LLC, 13 Parcels LLC, 700 NE 1st LLC, and 44 NW 11th LLC (the "Orion Foreclosure").

88.    On or about November 13, 2009, the Federal Deposit Insurance Corporation seized Orion Bank and sold its assets to Iberia Bank, which assumed the Orion Foreclosure and became the substituted plaintiff.

89.    On or about December 1, 2011, Final Default Judgments of Foreclosure were entered in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, in the Orion Foreclosure for the following amounts due and owing to Iberia Bank (the "Iberia Judgments"):

      a.   $3,428,909.00 against 46 NE 10th LLC;

      b.   $21,774,261.16 against 13 Parcels LLC;

      c.   $3,187,153.74 against 700 NE 1st LLC; and

      d.   $2,676,267.18 against 44 NW 11th LLC.

90.    Pursuant to the Iberia Judgments, a public foreclosure sale was scheduled for January 12, 2013 (the "Iberia Foreclosure Sale").

91.    OB Florida CRE Holdings, LLC, a wholly owned affiliate of Iberia Bank, purchased the real property at the Iberia Foreclosure Sale.

92.    On or about March 12, 2012, Miami Third, LLC purchased the bundle of 17 parcels acquired by OB Florida CRE Holdings, LLC in a privately negotiated transaction for $8,737,500.00. This transaction was agreed upon prior to the Iberia Foreclosure Sale.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

93.     On May 7, 2013, Miami Third, LLC transferred title of 46 NE 10th Street by special warranty deed to Miami First, LLC.

94.     Also on May 7, 2013, Miami Third, LLC sold 44 NW 11th Street to A & L Trust Associates, LLC for $1.5 million. That same day, A & L Trust Associates, LLC conveyed the property to Miami NE 11th LLC, a Florida entity then managed by Roberts.

95.     The series of transfers following the Fifth Third Foreclosure Sale and the Iberia Foreclosure Sale was a shell game that amounted to a malicious and fraudulent scheme by Falcone to purchase back the same properties formerly owned by entities in which Plaintiffs held approximately a 25% interest, that owned and/or managed various properties that comprise of the Miami Worldcenter Project, under the guise of a different Falcone-controlled entity at a significantly lower purchase price, and to the exclusion of Plaintiffs.

**D.     Fraudulent Transfers**

96.     On March 11, 2011, 701 NE 1st LLC conveyed 701 NE 1st Avenue to Miami Second, LLC for a purchase price of $622,300, approximately $2.5 million less than the original purchase price. Such transfer was prohibited under the Parties' Harcone 44, LLC Operating Agreement.

97.     On March 11, 2011, Miami 941 Property LLC sold 941-947 N. Miami Avenue to Miami Second, LLC for a purchase price of $311,000, approximately $1.5 million less than the original purchase price. Such transfer was prohibited under the Parties' Harcone 44, LLC Operating Agreement.

98.     Falcone has a direct, beneficial, and/or financial interest in Miami Second, LLC.

17

99.     Around October 2013, an equity interest in the Miami Worldcenter Project was sold to CIM Group, a national real estate investment firm, further diluting and devaluing Plaintiffs' interest.

100.     As a direct consequence of their respective actions, Falcone and the Primary and Secondary Falcone Entities have deprived Plaintiffs of their equity interests in the various entities and thereby the Miami Worldcenter Project, to which Plaintiffs are entitled.

101.     Plaintiffs have retained the law firm of Black, Srebnick, Kornspan & Stumpf, P.A. to represent them in this action and are obligated to pay said firm attorneys' fees and costs in exchange for their services.

102.     All conditions precedent to the maintenance of this action have occurred, been performed, or have otherwise been waived, excused, or satisfied.

## COUNT I – BREACH OF CONTRACT
### (Falcone and Falcon Park West, LLC)

103.     Plaintiffs reallege paragraphs 1 through 102 as if fully set forth herein.

104.     Plaintiffs entered into the Harcone 44, LLC Operating Agreement with Falcon Park West LLC.

105.     Plaintiffs fully performed all obligations, including, but not limited to, making all required capital contributions.

106.     Falcone, through Falcon Park West, LLC, breached the Harcone 44, LLC Operating Agreement by, among other things, excluding and avoiding Plaintiffs' equity interests and rights.

107.     Examples of Falcone's and Falcon Park West, LLC's breaches include, but are not limited to:

       a.     Renegotiation of the Africa Israel deal to the detriment of Plaintiffs;

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

b.       Failure to provide Plaintiffs with their share of the profits of and/or cash distributions from PWV Member, LLC;

c.       Diluting Plaintiffs' interest in the Miami Worldcenter Project by bringing in Centurion; and

d.       Defaulting on the loans related to key Assemblage properties.

108.    Plaintiffs have suffered damages as a direct and proximate result of Falcone's and Falcon Park West, LLC's breach.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Falcone and Falcon Park West, LLC for compensatory damages, special damages, including, but not limited to, lost profits, interest, costs, and such other and further relief as this Court deems just and proper.

## COUNT II – DECLARATORY JUDGMENT
**(Falcone Group, LLC, Falcon Commercial Development, LLC, Falcon Park West, LLC, Falcon Park West II, LLC, Miami First, LLC, Miami Second, LLC, Miami Third, LLC, Miami Worldcenter Holdings LLC, MR 44 MGR LLC, PWV Group 1 Holdings, LLC, Park West Ventures, LLC, PWV Member, LLC, Miami A/I, LLC, and Centurion Partners PW Investors, LLC)**

109.    Plaintiffs reallege paragraphs 1 through 102 as if fully set forth herein.

110.    As set forth above, the Parties intended to and did in fact enter into joint venture agreements (the "Miami Worldcenter JV Agreements") to acquire and develop properties for the Assemblage, and ultimately to sell the Miami Worldcenter Project. The Miami Worldcenter JV Agreements were executed through a series of operating agreements, most notably the Harcone 44, LLC Operating Agreement. The Miami Worldcenter JV Agreements consisted of Plaintiffs' 25% interest and Defendants' 50% interest, which was apportioned between Falcone and/or the Primary Falcone Entities.

19

111.    Plaintiffs fully performed all obligations imposed upon them by the Miami Worldcenter JV Agreements, including, but not limited to, making all required capital contributions.

112.    Through their actions, Defendants have excluded and avoided Plaintiffs' equity interests and rights in the Miami Worldcenter Project and the various Miami Worldcenter Project LLCs.

113.    There is a bona fide dispute between the parties concerning Plaintiffs' interests.

114.    Defendants' conduct as described herein requires that this Court declare Plaintiffs' rights with respect to the Miami Worldcenter JV Agreements.

115.    Plaintiffs have a justiciable question as to the existence or non-existence of their rights, status, powers, or privileges, or as to the facts upon which the existence of such rights, status, powers, or privileges do or may depend.

116.    Plaintiffs are in doubt as to their rights, status, powers, and/or privileges with respect to their joint venture agreement with Defendants, and as to their equity interests in the Miami Worldcenter Project and/or the various Miami Worldcenter Project LLCs.

117.    Plaintiffs seek a declaration of the rights of the parties under the law and contracts as described herein.

118.    There is a bona fide, actual, present, and practicable need for declaration with respect to the issues alleged herein.

119.    Plaintiffs respectfully request that this Court take jurisdiction over this matter and declare the rights of the parties thereto.

**WHEREFORE**, Plaintiffs respectfully request that the Court take jurisdiction over the parties, all of whom are presently before this Court, and provide the following relief:

20

a.      Advance this cause on its calendar pursuant to Section 86.111, Florida Statutes;

b.      Declare that one or both Plaintiffs owns: (1) an equivalent equity interest in all the various Miami Worldcenter Project LLCs and/or successor entities and/or assignees, and (2) equivalent equity and/or beneficial ownership interests in the respective amounts established by the terms of Miami Worldcenter JV Agreements;

c.      Order Defendants to specifically perform their obligations under the Miami Worldcenter JV Agreements, by taking all actions necessary to provide one or both Plaintiffs with the benefits of their bargain and to provide them with their appropriate ownership interests in the various Miami Worldcenter Project LLCs and/or successor entities and/or assignees in accordance with the terms of their respective operating agreements, and to enable Plaintiffs to retain and/or receive their respective interests in those entities; or

d.      To the extent that property owned by the various Miami Worldcenter Project LLCs was improperly transferred, assigned, and/or otherwise conveyed to the Secondary Falcone Entities and/or successor entities and/or assignees, declare that one or both Plaintiffs has an equity interest, in an amount to be determined by this Court, in the Secondary Falcone Entities and/or successor entities and/or assignees to make Plaintiffs whole; or

e.      Award Plaintiffs compensatory damages for the loss of capital contributions that resulted from Defendants' actions including, but not limited to, improperly transferring properties;

f.      Award Plaintiffs the costs incurred by them in connection with this action pursuant to Section 86.081, Florida Statutes; and

g.      Order such other and further relief as it deems just and proper.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

## COUNT III – BREACH OF FIDUCIARY DUTY
### (Against Falcone)

120.    Plaintiffs reallege paragraphs 1 through 102 as if fully set forth herein.

121.    Falcone, through his position as a fiduciary – as a managing member of Harcone 44, LLC and the various Miami Worldcenter Project LLCs – owes duties of due care, undivided loyalty, good faith, and truthful disclosure.

122.    In his managerial capacity, Falcone had an obligation to be the steward of the monetary contributions of the contributing members, including Plaintiffs.

123.    Falcone violated and breached his fiduciary duties in the following manner:

a.    Falcone failed to disclose information regarding the various Miami Worldcenter Project LLCs and/or the properties acquired or to be acquired as part of the Assemblage, particularly regarding the Africa Israel transaction, which Plaintiffs were and continue to be entitled;

b.    Prior to its consummation, Falcone failed to disclose the MWC Ventures, LLC Operating Agreement to Plaintiffs, the terms of which dilute and devalue Plaintiffs' interest in Harcone 44, LLC and the Miami Worldcenter Project;

c.    The MWC Ventures, LLC Operating Agreement includes aspects constituting self-dealing by Falcone;

d.    The A/I Purchase includes aspects that constitute self-dealing by Falcone;

e.    Falcone made unauthorized unilateral decisions, including conveyances of property owned by 150 NE 7th LLC, Miami Auction Prop LLC, 701 NE 1st LLC, and Miami 941 Property LLC, without Plaintiffs' knowledge and/or consent;

22

f.      Falcone acted in bad faith when he deliberately allowed the Fifth Third and Orion Foreclosures to occur knowing that he could purchase back the properties at a significantly lower price and then engaged in self-dealing by actually purchasing back the properties below fair market value through Secondary Falcone Entities, of which Falcone has a direct beneficial and/or financial interest.

124.    Falcone's conduct was not an exercise of good faith business judgment.

125.    As a direct and proximate result of Falcone's breach of fiduciary duty and self-dealing in and misuse of corporate assets, Plaintiffs have sustained, and will continue to sustain, substantial harm.

126.    Falcone is liable to Plaintiffs as a result of the acts alleged herein.

127.    Plaintiffs also hereby reserve the right to assert a claim against Falcone for punitive damages upon satisfying the applicable statutory prerequisites.

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment against Falcone and award compensatory damages, special damages, including, but not limited to, lost profits, interest, and costs, and such other and further relief as this Court deems just and proper, including, but not limited to, the imposition of a constructive trust and/or equitable lien.

### COUNT IV – AVOIDANCE OF FRAUDULENT CONVEYANCE
**(Against Falcone, Miami First, LLC, and Miami Third, LLC)**

128.    Plaintiffs reallege paragraphs 1 through 102 as if fully set forth herein.

129.    This is an action pursuant to Section 726.105(1)(a), Florida Statutes, against Falcone, Miami First, LLC, and Miami Third, LLC.

130.    Plaintiffs are creditors of Falcone and/or Miami First, LLC and Miami Third, LLC because Plaintiffs contributed approximately $40 million in capital investment to the Miami

23

Worldcenter Project which has not and will not be returned to them in accordance with their rights as an equity member of the various entities.

131.    As a result of the Fifth Third and Orion Foreclosures, from December 2010 through March 2012, Miami First, LLC and Miami Third, LLC acquired 45 parcels of real property, some or all of which were formerly owned by the various Miami Worldcenter Project LLCs, of which Plaintiffs had an approximate 25% ownership interest.

132.    Miami First, LLC and Miami Third, LLC were formed by or with Falcone to avoid Plaintiffs' ownership interests and to deprive Plaintiffs of substantial value that they rightfully owned and are/were entitled.

133.    Miami First, LLC and Miami Third, LLC acquired the parcels with the actual intent to hinder, delay, or defraud Plaintiffs of their rights.

134.    Evidence of this fraudulent intent includes, but is not limited to, the following:

　　　　a.    Falcone, in his managerial capacity, controlled Park West 3, LLC, Park West 5, LLC, Miami Auction Prop LLC, 950 NE 2nd LLC, 915 N Miami LLC, 701 N Miami LLC, 46 NE 10th LLC, 13 Parcels LLC, 70 NE 1st LLC, and 44 NW 11th LLC when they stopped paying the mortgage loans on the real property owned by these LLCs and knowingly and intentionally caused them to be foreclosed;

　　　　b.    As a result of the foreclosures, the properties owned by Park West 3, LLC, Park West 5, LLC, Miami Auction Prop LLC, 950 NE 2nd LLC, 915 N Miami LLC, 701 N Miami LLC, 46 NE 10th LLC, 13 Parcels LLC, 70 NE 1st LLC, and 44 NW 11th LLC were transferred to OB Florida CRE Holdings, LLC and Walnut & Vine Properties I, LLC, which Falcone

24

knowingly and intentionally orchestrated. OB Florida CRE Holdings, LLC and Walnut & Vine Properties I, LLC then transferred the properties to insiders;

c.      The transfers were to or for the benefit of Falcone and/or Falcone-related entities;

d.      The transfers were concealed from Plaintiffs;

e.      The transfers rendered Park West 3, LLC, Park West 5, LLC, Miami Auction Prop LLC, 950 NE 2nd LLC, 915 N Miami LLC, 701 N Miami LLC, 46 NE 10th LLC, 13 Parcels LLC, 70 NE 1st LLC, and 44 NW 11th LLC insolvent;

f.      Falcone, through Miami First, LLC and Miami Third, LLC, retained possession or control of Park West 3, LLC, Park West 5, LLC, Miami Auction Prop LLC, 950 NE 2nd LLC, 915 N Miami LLC, 701 N Miami LLC, 46 NE 10th LLC, 13 Parcels LLC, 70 NE 1st LLC, and 44 NW 11th LLC's properties after the transfers were made; and

g.      The transfers were of substantially all of Park West 3, LLC, Park West 5, LLC, Miami Auction Prop LLC, 950 NE 2nd LLC, 915 N Miami LLC, 701 N Miami LLC, 46 NE 10th LLC, 13 Parcels LLC, 70 NE 1st LLC, and 44 NW 11th LLC's assets.

135.    Miami First, LLC and Miami Third, LLC did not take Park West 3, LLC, Park West 5, LLC, Miami Auction Prop LLC, 950 NE 2nd LLC, 915 N Miami LLC, 701 N Miami LLC, 46 NE 10th LLC, 13 Parcels LLC, 70 NE 1st LLC, and 44 NW 11th LLC's properties in

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

good faith, and did not provide reasonably equivalent value to the LLCs for their respective rights to their properties.

136.    Plaintiffs have suffered, and continue to suffer, damages as a direct and proximate result of these fraudulent transfers.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Falcone, Miami First, LLC, and Miami Third, LLC and declare that one or both Plaintiffs has an equity interest, in an amount to be determined by this Court, in Miami First, LLC and Miami Third, LLC and/or successor entities and/or assignees to make Plaintiffs whole or, alternatively, award damages against these Defendants, award Plaintiffs attorneys' fees and costs pursuant to Section 726.108(1)(c)(3), Florida Statutes, and pre-judgment and post-judgment interest, and order such other and further relief as it deems just and proper.

### COUNT V – AVOIDANCE OF FRAUDULENT CONVEYANCE
**(Against Falcone, PWV Group 1 Holdings, LLC, Park West Ventures, LLC and Miami A/I, LLC)**

137.    Plaintiffs reallege paragraphs 1 through 102 as if fully set forth herein.

138.    This is an action pursuant to Section 726.105(1)(a), Florida Statutes, against Falcone, PWV Group 1 Holdings, LLC, Park West Ventures, LLC, and Miami A/I, LLC.

139.    150 NE 7th LLC was intended to have and in fact had contractual rights to acquire the A/I Properties.

140.    Plaintiffs are creditors of Falcone and/or PWV Group 1 Holdings, LLC, Park West Ventures, LLC, and Miami A/I, LLC because they contributed approximately $14 million towards the earnest money deposit on the purchase of the A/I Properties which has not and will not be returned to them.

26

141.    As a result of the dispute under the Initial A/I Agreement, Plaintiffs lost their deposit to the sellers.

142.    150 NE 7th LLC assigned all of its rights to purchase the A/I Properties to PWV Group 1 Holdings, LLC in an effort to avoid Plaintiffs' 25% ownership interests and to deprive Plaintiffs of substantial value that they rightfully owned and are/were entitled.

143.    150 NE 7th LLC did not receive any consideration from PWV Group 1 Holdings, LLC in return for 150 NE 7th LLC's assignment of rights to purchase the A/I Properties.

144.    PWV Group 1 Holdings, LLC acquired the A/I Properties with the actual intent to defraud Plaintiffs by applying Plaintiffs' deposit under the Initial A/I Agreement to the A/I Purchase.

145.    The fraudulent conveyance by PWV Group 1 Holdings, LLC to Miami A/I, LLC was intentionally made to hinder, delay, or defraud Plaintiffs of their rights.

146.    Evidence of this fraudulent intent includes, but is not limited to, the facts that:

  a.    Falcone, in his managerial capacity, was in control of 150 NE 7th LLC when he failed to satisfy the terms of the Initial A/I Agreement, which resulted in the loss of Plaintiffs' deposit;

  b.    As a result of a negotiated deal to resurrect the sales transaction to purchase the A/I Properties, Falcone knowingly and intentionally orchestrated an assignment of 150 NE 7th LLC's rights to PWV Group 1 Holdings, LLC. PWV Group 1 Holdings, LLC then transferred the properties to Miami A/I, LLC, an insider;

  c.    The transfers were to or for the benefit of Falcone and/or Falcone-related entities;

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

     d.     The transfers were concealed from Plaintiffs;

     e.     The transfers rendered 150 NE 7th LLC insolvent; and

     f.     The transfers were of substantially all of 150 NE 7th LLC's assets.

147.    PWV Group 1 Holdings, LLC and Miami A/I, LLC did not take 150 NE 7th LLC's properties in good faith, and did not provide reasonably equivalent value or consideration to the LLC for its respective rights to the A/I Properties.

148.    Plaintiffs have suffered, and continue to suffer, damages as a direct and proximate result of these fraudulent transfers.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Falcone, PWV Group 1 Holdings, LLC, Park West Ventures, LLC, and Miami A/I, LLC, and declare that one or both Plaintiffs has an equity interest, in an amount to be determined by this Court, in PWV Group 1 Holdings, LLC, Park West Ventures, LLC, and Miami A/I, LLC and/or successor entities and/or assignees to make Plaintiffs whole or, alternatively, award damages against these Defendants, award Plaintiffs attorneys' fees and costs pursuant to Section 726.108(1)(c)(3), Florida Statutes, and pre-judgment and post-judgment interest, and order such other and further relief as it deems just and proper.

### COUNT VI – AVOIDANCE OF FRAUDULENT CONVEYANCE
#### (Against Falcone and Miami Second, LLC)

149.    Plaintiffs reallege paragraphs 1 through 102 as if fully set forth herein.

150.    This is an action pursuant to Section 726.105(1)(a), Florida Statutes, against Falcone and Miami Second, LLC.

151.    Plaintiffs are creditors of Falcone and/or Miami Second, LLC because they contributed substantial capital investment to 701 NE 1st LLC and Miami 941 Property LLC for the purchase of 701 NE 1st Avenue and 941-947 N. Miami Avenue, respectively, which has not

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

and will not be returned to them in accordance with their rights as an equity member of 701 NE 1st LLC and Miami 941 Property LLC.

152.     As set forth above, 701 NE 1st LLC conveyed 701 NE 1st Avenue to Miami Second, LLC for a purchase price of $622,300, approximately $2.5 million less than the original purchase price.

153.     As set forth above, Miami 941 Property LLC sold 941-947 N. Miami Avenue to Miami Second, LLC for a purchase price of $311,000, approximately $1.5 million less than the original purchase price.

154.     The acquisition of 701 NE 1st Avenue and 941-947 N. Miami Avenue by Miami Second, LLC had a direct effect on Plaintiffs in that it deprived them of substantial value in land and the development thereof that they rightfully owned and are/were entitled.

155.     Miami Second, LLC acquired 701 NE 1st Avenue and 941-947 N. Miami Avenue with the actual intent to hinder, delay, or defraud Plaintiffs of their rights.

156.     Evidence of this fraudulent intent includes, but is not limited to, the following:

     a.     Falcone, in his managerial capacity, was in control of 701 NE 1st LLC and Miami 941 Property LLC when the transfers were made;

     b.      The transfers of 701 NE 1st Avenue and 941-947 N. Miami Avenue were to insiders;

     c.     The transfers were to and/or for the benefit of a Falcone-related entity;

     d.     The transfers were concealed from Plaintiffs;

     e.     701 NE 1st LLC and Miami 941 Property LLC were insolvent at the time of the transfers or became insolvent shortly after the transfers were made;

29

      f.     Falcone, through Miami Second, LLC, retained possession or control of 701 NE 1st Avenue and 941-947 N. Miami Avenue after the transfers were made;

      g.    The transfers were of substantially all of the assets of 701 NE 1st LLC and Miami 941 Property LLC, rendering the entities assetless.

157.    Miami Second, LLC did not take 701 NE 1st Avenue and 941-947 N. Miami Avenue in good faith, and did not provide reasonably equivalent value to 701 NE 1st LLC and Miami 941 Property LLC, respectively, for its rights to the properties.

158.    Plaintiffs have suffered, and continue to suffer, damages as a direct and proximate result of these fraudulent transfers.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Falcone and Miami Second, LLC and declare that one or both Plaintiffs has an equity interest, in an amount to be determined by this Court, in Miami Second, LLC and/or successor entities and/or assignees to make Plaintiffs whole or, alternatively, award damages against these Defendants, award Plaintiffs attorneys' fees and costs pursuant to Section 726.108(1)(c)(3), Florida Statutes, and pre-judgment and post-judgment interest, and order such other and further relief as it deems just and proper.

<u>**COUNT VII – CONSTRUCTIVE FRAUD**</u>
**(Against Falcone, Falcone Group, LLC, Falcon Commercial**
**Development, LLC, Falcon Park West, LLC, and Falcon Park West II, LLC)**

159.    Plaintiffs reallege paragraphs 1 through 102 as if fully set forth herein.

160.    As set forth herein, Falcone and the Primary Falcone Entities have acted wrongfully and inequitably.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

161.    Falcone breached his fiduciary relationship with Plaintiffs for his and/or the Primary Falcone Entities' financial benefit and to Plaintiffs' financial detriment.

162.    Falcone and the Primary Falcone Entities acquired control and influence over Plaintiffs by virtue of their role as joint venturers with Plaintiffs and by their managerial roles in the various Miami Worldcenter Project LLCs.

163.    In reliance on Falcone's contractual and fiduciary responsibilities, Plaintiffs contributed approximately $40 million in exchange for equity interests and relied on and trusted Falcone's representations of his expertise and reputation to manage and promote the development of the Miami Worldcenter Project for Plaintiffs' benefit.

164.    Falcone abused his influence over Plaintiffs by denying and refusing to provide Plaintiffs with information, to which they were entitled, regarding the various Miami Worldcenter Project LLCs and/or the properties they acquired, are acquiring, or reasonably anticipated acquiring as part of the Assemblage.

165.    Falcone abused his influence and acted in a fraudulent manner by entering into other ventures and forming the Secondary Falcone Entities to acquire properties owned or formerly owned by the various Miami Worldcenter Project LLCs, including the various entities in which Plaintiffs had a substantial equity interest.

166.    Plaintiffs have suffered substantial damages as a direct and proximate result of Falcone's and the Falcone Entities' constructive fraud.

167.    Plaintiffs also reserve the right to assert a claim against Falcone for punitive damages upon satisfying the applicable statutory prerequisites.

**WHEREFORE,** Plaintiffs respectfully request that the Court enters judgment against Falcone, Falcone Group, LLC, Falcon Commercial Development, LLC, Falcon Park West, LLC,

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

and Falcon Park West II, LLC and awards Plaintiffs compensatory damages, special damages including but not limited to lost profits, interest, and costs, and such other and further relief as this Court deems just and proper.

## COUNT VIII – CIVIL CONSPIRACY
### (Against Falcone, PWV Member, LLC, and Centurion)

168.    Plaintiffs reallege paragraphs 1 through 102 as if fully set forth herein.

169.    Falcone, PWV Member, LLC, and Centurion acted in concert with each other and conspired to engage in a scheme for Falcone to breach his fiduciary duty to Plaintiffs, the Harcone 44, LLC Operating Agreement, and the Miami Worldcenter JV Agreements by diluting Plaintiffs' interests in the Miami Worldcenter Project.

170.    Falcone, PWV Member, LLC, and Centurion caused the devaluation of Plaintiffs' interests in Harcone 44, LLC.

171.    Falcone, PWV Member, LLC, and Centurion performed overt acts, including the execution of the MWC Ventures, LLC Operating Agreement, in furtherance of the conspiracy.

172.    Plaintiffs have suffered, and continue to suffer, damages as a direct and proximate result of Falcone, PWV Member, LLC, and Centurion's improper actions.

173.    Falcone, PWV Member, LLC, and Centurion's actions were intentional, willful, wanton, malicious, and calculated to cause damage to Plaintiffs. Accordingly, Plaintiffs reserve the right to further amend this Complaint to seek punitive damages in accordance with Section 768.72, Florida Statutes.

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment against Falcone, PWV Member, LLC, and Centurion and award damages, costs, pre-judgment and post-judgment interest, and such other and further relief that this Court deems just and proper.

32

## COUNT IX – UNJUST ENRICHMENT

### (Against Falcone, Miami First, LLC, Miami Second, LLC, Miami Third, LLC, Miami Worldcenter Holdings LLC, Miami A/I, LLC, and Centurion)

174.    Plaintiffs reallege paragraphs 1 through 102 as if fully set forth herein.

175.    Falcone, the Secondary Falcone Entities, Miami A/I, LLC, and Centurion retain the financial and/or ownership rights and benefits of the properties formerly owned by the various Miami Worldcenter Project LLCs, including 150 NE 7th LLC, all of which were acquired using funds contributed by Plaintiffs.

176.    As a direct and proximate result of the acts alleged herein, Falcone, individually and/or by and through the Secondary Falcone Entities and Miami A/I, LLC, wrongfully deprived Plaintiffs of substantial wealth and has been unjustly enriched at Plaintiffs' expense.

177.    As a direct and proximate result of the acts alleged herein, Centurion intentionally diluted Plaintiffs' interests and wrongfully deprived Plaintiffs of substantial wealth and has been unjustly enriched at Plaintiffs' expense.

178.    Based on the foregoing, it would be inequitable for Falcone, the Secondary Falcone Entities, Miami A/I, LLC, and Centurion to retain the benefit of 100% ownership of the subject properties without paying to Plaintiffs the value Plaintiffs contributed.

179.    While Defendants could easily return Plaintiffs' investment, no amount of money can repair the damage that Falcone has caused through his deceit. Thus, no adequate legal remedy is available to Plaintiffs.

**WHEREFORE**, Plaintiffs demand that the Court enter judgment against Falcone, Miami First, LLC, Miami Second, LLC, Miami Third, LLC, Miami Worldcenter Holdings LLC, Miami A/I, LLC, and Centurion and award to Plaintiffs restitution from each of the above-named Defendants and order disgorgement of all profits, benefits, and/or other compensation obtained

33

by Defendants as a result of the acts and transactions complained of herein, the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses, and such other and further relief as the Court may deem just and proper.

## COUNT X – ACCOUNTING OF LLC DEFENDANTS' TRANSACTIONS UNDERTAKEN BY FALCONE AS FIDUCIARY OF PLAINTIFFS

180.     Plaintiffs reallege paragraphs 1 through 102 as if fully set forth herein.

181.     As a result of the fraudulent conduct and breach of the fiduciary duties owed by Falcone to Plaintiffs, Plaintiffs are entitled to an accounting of all money and property received by or entrusted to the LLC Defendants for the benefit of Plaintiffs, but wrongfully diverted from Plaintiffs as alleged herein.

182.     Although Plaintiffs have arrived at an estimate of approximately $40 million they were deprived of by reason of the actions of the LLC Defendants, because the true books and records concerning these transactions have been and are in the exclusive control of the LLC Defendants and Falcone, Plaintiffs require an accounting in order to determine the true amounts owed to them, including, but not limited to, return on investments diverted by Falcone as alleged herein.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

34

Dated: March 25, 2014

Respectfully submitted,

Black, Srebnick, Kornspan & Stumpf, P.A.
201 S. Biscayne Boulevard
Suite 1300
Miami, Florida 33131
Tel:     (305) 371-6421
Fax:     (305) 371-6322

By: /s/ Jared Lopez
       Howard M. Srebnick, Esq.
       Florida Bar No. 919063
       hsrebnick@royblack.com
       Jared Lopez, Esq.
       Florida Bar No. 103616
       jlopez@royblack.com
       civilpleadings@royblack.com

and

Whiteman Osterman & Hanna LLP
One Commerce Plaza
Albany, New York 12260
Tel:     518-487-7600
Fax:     518-487-7777

By: /s/ Leslie M. Apple
       Leslie M. Apple, Esq.
       *pro hac vice* admission pending
       Genevieve M. Trigg, Esq.
       *pro hac vice* admission pending

*Counsel for Plaintiffs*

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard, Suite 1300 • Miami, Florida 33131 • Phone 305-371-6421 • Fax 305-371-6322 • www.RoyBlack.com

Exhibit "A"

# OPERATING AGREEMENT
## OF
## HARCONE 44, LLC

THIS OPERATING AGREEMENT (the "Agreement") of HARCONE 44,  LLC, a Florida limited liability company (the "LLC"), is made and entered into effective as of August 22, 2006 (the "Effective Date") by and between HARCONE 44B LLC,  a Florida limited liability company ("Roberts") and FALCON PARK WEST LLC, a Florida limited liability company ("Falcon").

### Background and Basis for Agreement

1.     The LLC was formed pursuant to the Florida Limited Liability Act and the Articles of Organization were filed and effective with the Florida Secretary of State on or about August 22, 2006.

2.     Roberts and Falcon now desire to set forth the terms and conditions by which the LLC will be governed as of the Effective Date hereof.

In consideration of the foregoing recitals which are hereby incorporated as a part of this Agreement, the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members and the LLC hereby agree as follows:

### Section 1
### Formation and Purposes

1.1     *Formation*. All of the Members hereby:

(a)     Acknowledge the formation of the LLC as a limited liability company pursuant to the Act by virtue of the Articles of Organization filed, with the Florida Department of State;

(b)     Confirm and agree to their status as a Member and their subscription for Interests, as that term is defined herein, upon the terms and conditions set forth in this Agreement and as set forth on *Schedule A* attached hereto; and

(c)     Execute and adopt this Agreement as the limited liability company agreement of the LLC, pursuant to the meaning of Section 608.402(13) of the Act.

1.2     *Name*. The name of the limited liability LLC shall be "Harcone 44, LLC", and all business of the LLC shall be conducted under that name.

1.3     *Governing Law*. This Agreement and all questions with respect to the rights and obligations of the Members, the construction, enforcement, and interpretation hereof, and the

formation, administration, and termination of the LLC, shall be governed by the provisions of the Act and other applicable laws of the State of Florida.

1.4     *Defined Terms*. Except as otherwise specified or when the context may otherwise require, all capitalized terms used in this Agreement shall have the meanings specified in Section 12 of this Agreement or the Section where such capitalized term is first defined.

1.5     *Purpose*. The LLC is organized as a joint venture between the Members to acquire real property in Miami Dade County, Florida and to engage in such other lawful activities as are reasonably necessary or useful to the furtherance of the foregoing purpose, upon and subject to the terms and conditions of this Agreement.

1.6     *Term of the LLC*. The term of the LLC commenced upon filing of Articles of Organization with the Florida Department of State. The LLC shall have perpetual existence, unless sooner terminated as provided in this Agreement or the Act.

**Section 2**
**Management / Members — Status, Rights, and Obligations**

2.1     *Members*.

(a)     There shall be a single class of Members.  Management of the LLC shall be by a Management Committee as provided in this Agreement.  From and after the date of this Agreement, the Members shall be Roberts and Falcon, or any permitted successor or assign thereof admitted to the LLC in accordance with the terms of this Agreement. The respective addresses of the Members and respective Percentage Interests of the Members are set forth on *Schedule A* hereto.

(b)     Additional Members of the LLC may be admitted from time to time and upon such terms and conditions as Approved by the Members and in accordance with the provisions of this Agreement. The address of each such additional Member shall be added to *Schedule A*, which shall thereby be amended.

2.2     *No Right to Withdraw*. Except as otherwise expressly provided herein, no Member shall have any right to voluntarily resign or otherwise withdraw from the LLC without the written consent of all remaining Members.

2.3     *Voting by Members*. Except as otherwise provided herein, each Member of the LLC shall be entitled to vote their Percentage Interests on all matters on which Members are entitled to vote or consent pursuant to this Agreement.  Except as otherwise provided herein, the affirmative vote or consent of all of the Members shall be required for any membership action.

2.4     *Limited Authority of Members*. Except as expressly provided herein, no Member shall have authority to take or engage in any action, in its capacity as a Member, to bind the LLC in any manner.

2

2.5     *Consent of Members in Lieu of Meeting*. Unless otherwise provided in this Agreement or by law, any action which may be taken at any meeting of Members of the LLC may be taken without a meeting, without prior notice, and without a vote if a written consent, setting forth the action so taken, is signed in person, by proxy, or by facsimile signature by all of the Members. Such consent shall be delivered to the LLC by delivery to the Management Committee and shall be filed with the minutes of the meetings of Members in the records of the LLC. Facsimile signatures shall be deemed originals for purposes of this Section 2.5. Every written consent shall bear the signature of each Member who signs such consent, and no written consent shall be effective to take the LLC action referred to therein unless, within fifteen (15) days of the earliest consent delivered to the LLC in the manner required hereby, written consents signed by the requisite number of Members are so delivered to the LLC.

2.6     *Meetings; Notice*. Regular or special meetings of the Members shall be held from time to time, (i) at such place and time as shall be approved by the Members or (ii) at such place and time as shall be set by a Member upon ten (10) business days notice to the other Members.

2.7     *Waiver of Notice by Members*. Whenever any notice whatsoever is required to be given to any Member of the LLC under this Agreement or any provision of law, a waiver thereof, signed at any time, whether before or after the time of meeting, by the Member entitled to such notice shall be deemed equivalent to the giving of such notice. The attendance of a Member at a meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting and objects thereat, at the beginning thereof, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any meeting of the Members need be specified in any waiver of notice of such meeting.

2.8     *Quorum*. At all meetings of the Members, the presence of all of the Members shall constitute a quorum for the transaction of business. Though less than a quorum, a majority of the Members present at a meeting may adjourn the meeting, from time to time and without further notice, until a quorum shall be present; provided, however, that any Members absent from the adjourned meeting shall be provided written notice of such adjournment.

2.9     *Manner of Acting*. At all meetings of the Members, each Member shall be entitled to one vote on all matters which Members are entitled to vote pursuant to this Agreement or the Act.  Except as otherwise provided by law or this Agreement, the action of a unanimous vote of the Members shall be the act of the LLC.

2.10    *Conduct of Meetings*. A designee of the Management Committee shall call meetings of the Members to order and shall act as chair of the meeting. A second designee of the Management Committee shall record all actions at such meeting of the Members, which shall be maintained in an LLC minute book under the supervision of the Management Committee.

2.11    *Participation*. Members may participate in any meeting either in person or by means of a conference telephone or similar communications equipment through which all

3

persons participating in the meeting can hear each other. Participation in a meeting pursuant to this Section 2.11 shall constitute presence in person at the meeting.

**Section 3**
**Management of the LLC**

3.1    *Management of the LLC.*

(a)    The LLC shall be managed by a Management Committee, consisting of Arthur J. Falcone, as the representative of Falcon (the "Falcon Representative") and Marc Roberts, as the representative of Roberts (the "Roberts Representative"). In the event of the death, disability, resignation or Bankruptcy of Arthur J. Falcone as the Falcon Representative, Robert J. Falcone shall serve as the Falcon Representative. In the event of the death, disability, resignation or Bankruptcy of Robert J. Falcone as the Falcon Representative, Falcon shall be entitled to appoint an individual to serve as the Falcon Representative. In the event of the death, disability, resignation or Bankruptcy of Marc Roberts, Roberts shall be entitled to appoint an individual to serve as the Roberts Representative, provided, however, that notwithstanding the foregoing, in the event of the death, disability, resignation or Bankruptcy of Marc Roberts while Arthur J. Falcone is the Falcon Representative, then (A) for so long as Arthur J. Falcone is the Falcon Representative, (i) Arthur J. Falcone shall serve as the sole Manager of the LLC, and (ii) all references in this Agreement to the Management Committee shall apply to the Manager, and (B) after Arthur J. Falcone is no longer the sole Manager, then the Management Committee shall thereafter again be comprised of two (2) Representatives. Each individual serving on the Management Committee shall be entitled to one (1) vote on all matters coming before the Management Committee, and every decision and action of the Management Committee shall require the consent of all of the Member Representatives serving on the Management Committee.

(b)    The Management Committee shall meet as often as may be reasonably necessary, as determined in the sole but reasonable discretion of the Management Committee members. The actions of the Management Committee, when taken in accordance with this Agreement, shall bind the LLC. Except as otherwise provided in this Agreement, no decision of the Management Committee shall be made except at a meeting duly called with at least two (2) business days written notice, specifying the agenda for the meeting (which notice and agenda requirements may be waived by any of its members, and such notice and agenda requirements will be deemed to have been waived if the member participates in the meeting and has been provided with an agenda for the meeting, unless the Management Committee member objects at the outset of such meeting). Meetings may be held in person or telephonically whereby each of the members participating can hear each of the other members. Action by the Management Committee may also be taken and represented by unanimous written consent. The LLC's Secretary, or other duly appointed official, shall be responsible for taking minutes of the meetings and safekeeping them on behalf of the LLC.

(c)    The Management Committee may appoint a President, Secretary, one or more Vice-Presidents or such other officers, agents or other delegates of the LLC, with such

4

powers, authority and responsibilities as shall be assigned to them by the Management Committee.

(d)     Unless otherwise specified in a notice of resignation of a Manager, the acceptance of such resignation shall not be necessary to make it effective.  Any officer of the LLC may be removed at any time, with or without cause, by action of the Management Committee and his replacement, if any, may be approved by the Management Committee at the time of such removal.

3.2     *Powers of the Management Committee*.  Except as otherwise specifically provided in Section 3.9 and elsewhere in this Agreement, the Management Committee shall have full, exclusive and complete discretion, right, power, and authority to manage, control and make all decisions affecting the day-to-day business and affairs of the LLC and to do or cause to be done any and all acts, at the expense of the LLC on the terms provided herein, deemed by the Management Committee to be necessary or appropriate to effectuate the LLC business.

3.3     *No Management by Other Persons*.  No Person other than the Management Committee members and the duly appointed officers of the LLC and its authorized agents shall take part in the management, or the operation or control of the business and affairs of the LLC.  Except as expressly delegated by the Management Committee, no Person other than the Management Committee and the duly appointed officers or other authorized agents of the LLC shall be an agent of the LLC or have any right, power or authority to transact any business in the name of the LLC or to act for or on behalf of or to bind the LLC.

3.4     *Reliance by Third Parties*.  Any Person dealing with the LLC or the Management Committee may rely upon a certificate signed by the Management Committee as to:

(i)     the identity of the Management Committee or any member thereof;

(ii)     the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Management Committee or in any other manner germane to the affairs of the LLC;

(iii)     the Persons who are authorized to execute and deliver any instrument or document of or on behalf of the LLC; or

(iv)     any act or failure to act by the LLC or as to any other matter whatsoever involving the LLC or any Member.

3.5     *Budgets and Operating Plans*.  From time to time, the Members or Management Committee may prepare or cause the LLC's officers or other agents to prepare an operating plan and/or operating, financing and capital budgets for the LLC for a Fiscal Year or other period. Once approved by all members of the Management Committee (or all of the Members, if the Members prepared or caused the preparation of the budget and/or plan) such budget and/or plan shall constitute the operating plan and budget of the LLC for the Fiscal Year or other period in question, and no LLC disbursement shall be made and no binding agreement entered into by the

5

LLC, without the approval of all members of the Management Committee or all of the Members, as the case may be, if such disbursement or binding agreement would be inconsistent with (or in light of all available facts and circumstances would likely be inconsistent with) any then applicable operating plan and/or budget.

3.6    *Compensation*.  Except as expressly provided in this Agreement, no Member, Affiliate of a Member, Management Committee member, officer, employee or other agent of the LLC shall be entitled to receive a salary, compensation, fees or other remuneration from the LLC for services or other resources provided to the LLC without the consent or approval of all of the Members.  Notwithstanding the foregoing, the Members anticipate that the Members and their respective Affiliates may be involved in providing services related to the Property or the LLC.  Accordingly, any such Person shall be entitled to receive remuneration for such services, consistent with the customary and standard amounts paid for such services provided in Miami-Dade County.  The extent to which any one or more of the Members or their respective Affiliates will be engaged to provide such services shall be determined by the Members from time to time following the closing of the purchase of the Property.

3.7    *Brokers*.  Each of the Members represents and warrants to the other that none of them has employed, either on its own behalf or on behalf of the LLC, any broker or finder in connection with its investment in the LLC or the acquisition of the Property.  Each Member will indemnify and hold the other Members harmless from any loss, damage or expense, including attorneys' fees and costs, incurred as a result of the Member's breach of the foregoing representation and warranty.   This provision will survive the dissolution, liquidation and termination of the LLC.

3.8    *Reimbursement of Expenses.*   The LLC shall reimburse the Management Committee members and other agents of the LLC for all ordinary, necessary, and direct expenses incurred by the Management Committee and/or its delegates while acting on behalf of the LLC and in carrying out the LLC business.   Such reimbursements shall be made according to procedures or policies adopted by the Management Committee from time to time.

3.9    *Limitations on Authority of Management Committee*.  Notwithstanding the grant of authority to the Management Committee under this Section 3, the Management Committee may not authorize the LLC to take any of following actions without the consent of all of the Members:

(a)    Borrow funds, other than through the creation of ordinary trade payables incident to the operation of the LLC's business, lend funds, or act as guarantor, surety, or accommodation party for the debt of any  Person;

(b)    Sell, exchange, assign, convey, lease and/or transfer legal and equitable title to the Property or any other assets owned by the LLC;

(c)    Determine the amount of loans, capital contributions or advances to be made to the LLC;

6

(d)     Compromise any claim or dispute having an amount or value in issue in excess of $100,000;

(e)     Confess a judgment against the LLC;

(f)     Possess LLC property or assign the right of the LLC or its Members in specific LLC property for other than an LLC purpose;

(g)     Make, execute, or deliver any assignments for the benefit of creditors, or on the assignee's promise to pay the debts of the LLC;

(h)     File a petition for bankruptcy; answer a petition for involuntary bankruptcy; seek or acquiesce in the appointment of a receiver, trustee, custodian, or similar official for the LLC or any of its property; or answer a petition seeking such an appointment;

(i)     Do any act for which, notwithstanding contrary provisions of this Agreement, requires the unanimous consent of the Members under the Act;

(j)     Dissolve and wind up the LLC;

(k)     Admit additional or substitute Members;

(l)     Engage in any business activity other than that which is consistent with the LLC's purpose;

(m)     Engage in any business transaction with a Member or any Affiliate of the LLC or a Member;

(n)     Acquire any property other than the Property;

(o)     Enter in to a partnership or other venture, merge, or enter into any other form of reorganization, either alone or with another business entity;

(p)     Amend this Agreement;

(q)     Make a Capital Call;

(r)     Make a distribution to the Members under Section 5;

(s)     Make a determination under Section 10.1(d) as to whether indemnification or advancement of expenses is permissible; or

(t)     Take any other decision or action for which the approval of the Members is required under this Agreement or the Act.

The foregoing limitations set forth in this Section 3.9 shall not apply in the event that Marc Roberts (or, if applicable, a designee of Roberts) is no longer a member of the Management Committee, except that the following actions shall not be taken without the consent

7

of all of the Members, regardless of whether Marc Roberts is a member of the Management Committee or the designated representative of Roberts:

    (i)  Any amendment of this Agreement; or

    (ii)  Any admission of a new Member if the admission results in a dilution of Robert's Percentage Interest in a manner that is not proportionate with the dilution of Falcon's Percentage Interest; or

    (iii)  Any action that requires Marc Roberts to be personally liable on any indebtedness other than extensions of loans and guarantees that are existing at the time of the acquisition of the Property, provided that there is no increase in the amount of such loans or guarantees; or

    (iv)  Require Roberts to contribute additional capital to the LLC or advance any loans to the LLC; or

    (v)  Any action that results in any remuneration to Members or their Affiliates other than actions to maintain existing compensation or fee arrangements.

  3.10 *Deadlock; Dispute Resolution Procedures*. If at any time the Management Committee or the Members reach an impasse on any matter governed by Section 3, and they are unable to resolve the issue or decide upon an alternative course of action within three (3) days thereafter (such state of affairs being hereafter referred to as a "Deadlock"), the following procedures shall apply in the order as set forth hereunder:

    (a)  Any Member may declare that a Deadlock has occurred by giving notice thereof to the other Members and the Management Committee, in which case all of the Members and their respective advisors shall negotiate in good faith for a period of ten (10) days or such shorter or longer period as all of the Members may agree upon.

    (b)  If after the time period in subsection (a) elapses the Deadlock has not been resolved, any Member shall have the right to request review of such matter ("Executive Review") by Arthur J. Falcone (representing Falcon) if he is then a Falcon Representative and, if he is not, by another designee of Falcon, and by Marc Roberts (representing Roberts) if he is then a Roberts Representative and, if he is not, by another designee of Roberts, together with such other Persons as the Members may mutually agree upon ("Executives"). A Member shall exercise its right to request Executive Review by providing notice to the other Members in the manner notices are to be given hereunder. The Executives shall commence meeting within ten (10) days of the day Executive Review is requested, and shall engage in good faith efforts to resolve the deadlock within ten (10) days of such initial meeting, or such other time period that the Executives may agree upon. The Executives shall notify the Management Committee and Members stating whether or not they were able to resolve the Deadlock or any other outcome of the Executive Review during such period. If the Executives reach a decision or otherwise resolve the issue in question, such decision or other action shall be binding on the LLC, the Management Committee and the Members, in which case the Management Committee or its delegate(s) shall immediately carry out such decision or take the other action specified by the Executives. The

Executives shall thereafter have no authority or right to represent the LLC or act on its behalf (unless an Executive Review is subsequently required for another Deadlock).

(c)     If after the end of the Executive Review period described in subsection (b) above, the Deadlock is still not resolved, then either of Falcon or Roberts may within ten (10) days request, by giving notice to the other Members in the manner notices are to be given under this Agreement, submit the disagreement to mediation under the Commercial Mediation Rules of the American Arbitration Association.  If either of such Members so requests, the other of them may agree but shall not be obligated to submit to mediation to be held at the offices of the LLC. If such other Member agrees to attempt to resolve the matter through mediation within seven (7) days after either Falcon or Roberts requests such mediation, the mediator shall then be jointly selected by the Falcon and Roberts, but if they do not or cannot agree upon a mutually acceptable mediator within ten (10) days after deciding to submit the Deadlock matter to mediation, either of them may notify the Arbitration Association to appoint a mediator.  The mediator shall not have authority to impose a settlement upon the Members and the Management Committee, but will attempt to help them reach a satisfactory resolution of the disagreement.  The mediator shall end the mediation whenever, in the mediator's judgment, further efforts at mediation would not contribute to a resolution of the Deadlock matter; provided that either of Falcon or Roberts may end the mediation at any time after sixty (60) days from the date the mediator was selected.

(d)     If the matter is not submitted to mediation pursuant to subsection (c) hereof, or if after the mediation procedure terminates as set forth in subsection (c) hereof, the Deadlock matter is still not resolved, and, in either event, two years from the date of acquisition of the Property have elapsed, then either Falcon or Roberts, by providing notice to all other Members and the Management Committee in the manner notices are to be given under this Agreement, shall have the right to declare a "Deadlock Impasse" and to initiate the "Buy-Sell Option" set forth in Section 8.3.

## Section 4
### Capital Contributions and Financial Obligations of Members

4.1     *Capital Contributions*. Initial Capital Contributions and Additional Capital Contributions may sometimes hereinafter be referred to collectively as the "Capital Contributions," as the context may require.

(a)     *Initial Capital Contributions*. The Initial Capital Contributions of the Members are as set forth on *Schedule A*.

(b)     *Additional Capital Contributions*. Additional Capital Contributions shall arise in the event that it is determined, with the approval of the Members, that the LLC requires capital in addition to the Initial Capital Contributions.

4.2     *No Interest upon Contributions*. No Member shall be entitled to interest on its Capital Contributions.

9

4.3     *Capital Accounts*. Each Member's Capital Account shall be maintained in accordance with the following provisions:

(a)     Each Member's Capital Account shall be credited with the amounts of such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated to the Member pursuant to Section 5.

(b)     Each Member's Capital Account shall be charged with the amounts of cash and the fair market value of any property distributed by the LLC to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated to the Member pursuant to this Agreement.

(c)     If all or a portion of a Member's Interest is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the Transferred Interest.

4.4     *Capital Account Deficit*.  Except as otherwise provided by the Act, no Member shall have any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

4.5     *Return of Capital Contributions*. No Member shall be entitled to withdraw any part of its Capital Contributions or Capital Account or to receive any distribution from the LLC except as specifically provided in this Agreement.

4.6     *Member Loans or Services*. Loans or services by any Member to the LLC shall not be considered Capital Contributions.

4.7     *Advances/Equity Loans*. With the approval of the Members, any Member may lend or advance any funds to the LLC.  The amount of any such loan or advance shall not be treated as a Capital Contribution, but shall be a debt due from the LLC to such Member to be repaid in accordance with the terms of such loan or advance approved by the Members.  Each of the Members hereto agree that all equity loans or other funds advanced for carrying costs, etc. by Roberts and Falcon, as the case may be, will accrue interest from the date received by or paid for the benefit of the LLC at the rate of fifteen (15%) percent per annum.

(a)     Each Member shall contribute its Initial Capital Contribution on or before the acquisition of the Property.  The Initial Capital Contributions, as well as any other advances or funding approved by the Members under Section 4.1(b) above shall be collectively referred to as "Mandatory Contributions".

(b)     Each Member agrees to fund its obligations approved under Section 4.7(a) within fourteen (14) days of the receipt of notice from the Management Committee of the amount of funds needed by the LLC.

(c)     If any Member (a "Contributing Member") makes its Mandatory Contribution, and any of the other Members ("Non-Contributing Member") fails to make its Mandatory Contribution within ten (10) days after notice from a Contributing Member (the "Contribution Notice Period"), then as of the day after the Contribution Notice Period (i) each Non-Contributing Member will be in breach of this Agreement, (ii) the members of the Management Committee appointed by each Non-Contributing Member shall be deemed to have been removed for all purposes, and the Management Committee will thereafter be comprised solely of the members appointed by the Contributing Members, (iii) the Contributing Members will become entitled to appoint and remove all members of, and fill all vacancies on, the Management Committee, and (iv) in addition to all other remedies available at law or in equity, a Contributing Member may elect to (x) lend to the LLC the amount of the Non-Contributing Member's Mandatory Contribution (the "Covering Amount") or at its option advance the Covering Amount on behalf of the Non-Contribution Member as capital and treat the Covering Amount as a loan directly to the Non-Contributing Member, and (y) to treat the Contributing Member's Mandatory  Contribution as a loan  to the Company (collectively, a "Member Loan" if the Contributing Member elects to treat the Covering Amount as a Member Loan and if it does not, only the Contributing Member's Mandatory Contribution shall be deemed a Member Loan) on the terms set forth below.

(d)     If the Contributing Member(s) advances the Covering Amount to the LLC then, unless the Contributing Member elects to treat such advance as a loan to the Non-Contributing Member, then such advance, together with the Contributing Member's Mandatory Contribution, shall, in the aggregate, constitute a Member Loan on the following terms (if there are two Contributing Members, then between them they must advance the entire Non-Contributing Member's Mandatory Capital Contribution, divided between them as they may agree, or, in the absence of agreement, equally):

(i)     Each Member Loan will bear interest at the lower of (A) twenty-four percent (24%) per year and (B) the highest rate of interest allowed by law, compounding annually and computed on the 365-day basis, from the date advanced until repaid;

(ii)    Accrued interest will be payable monthly,

(iii)   The principal and all other sums due on a Member Loan will be payable in full ten (10) days' after demand by the holder given by notice to the LLC and the Non-Contributing Member at any time prior to payment and after the one hundred eightieth (180th) day following the date the Contributing Member funds the Non-Contributing Member's Mandatory Capital Contribution (the "Member Loan Maturity Date"), and may be prepaid without penalty; and

(iv)    All Net Cash from Operations must be used first to pay accrued interest and to prepay principal on all Member Loans.

(v)     If a Non-Contributing Member contributes to the LLC, as its Mandatory Contribution, an amount equal to its Mandatory Contribution plus all accrued (whether paid or unpaid) interest on the portion of all Member Loans equal to its previously unpaid Mandatory Contribution on or before the Member Loan Maturity Date, then, on the date following that payment, the LLC shall pay to Contributing Member the unpaid interest and principal of that portion of its Member Loan, and the former Non-Contributing Member's right to appoint Management Committee members, will thereby be restored.   If there are two Non-Contributing Members and one of them timely makes its Mandatory Contribution under this clause, then the former Non-Contributing Member will thereafter be a Contributing Member, the remaining balance of the original Contributing Member's Member Loan will continue to be a Member Loan and, as of the date of that payment, the former Non-Contributing Member will be deemed to have made a Member Loan equal to the amount of its Mandatory Contributions.  If both of the Non-Contributing Members timely make their Mandatory Contributions under this clause, then following the payment by the Company to the original Contributing Member, the remaining balance of the Member Loan, *i.e.*, the original Contributing Member's Mandatory Contribution, will be reclassified as a Capital Contribution.

(e)     Each Member hereby grants to the other a security interest in its Interest to secure the performance of its obligations under this Agreement.

(f)     If pursuant to Section 4.7(c) a Contributing Member elects to have the Covering Amount treated as a direct loan to the Non-Contributing Member, the terms of the loan shall be as set forth in Section 4.7(d)(i), (ii) and (iii), and any Net Cash from Operations otherwise distributable to the Non-Contributing Member shall be applied to repay such loan.

4.8     *Limited Liability*. Except as provided in this Agreement, no Member shall be required under any circumstances to contribute or lend any money or property to the LLC.

4.9     *Not for Benefit of Creditors*. The provisions of this Section 4 are not intended to be for the benefit of any creditor or other person (other than a Member in its capacity as Member) to whom any debts, liabilities, or obligations are owed by (or who otherwise has any claim against) the LLC or any of the Members, and no such creditor or other person shall obtain any right under any such provisions or shall by reason of any such provisions make any claim in respect of any debt, liability, obligation, or claim against the LLC or any of the Members.

4.10     *Formation Costs*. All reasonable costs and expenses incurred with respect to the formation of the LLC shall be borne by the LLC.

### Section 5
### Distributions of Cash and Property

5.1 *Net Cash from Operations*. "Net Cash from Operations" means the gross cash proceeds from the LLC operations less the portion thereof used to pay or establish reserves for all LLC expenses, debt payments, capital improvements, replacements, and contingencies. Subject to the Approval of the Members, Net Cash from Operations, if any, shall be distributed to the Members, *pro rata*, in accordance with their respective Percentage Interests.

5.2 *Liquidating Distributions*. Upon the dissolution and liquidation of the LLC in accordance with Section 7, the proceeds of the liquidation and any other assets of the LLC shall be distributed in the following order of priority:

     (a)   First, in payment to creditors of the LLC, including Members who are creditors, in the order of priority provided by law;

     (b)   Second, in payment to the Members in accordance with their positive Capital Account balances, until such Capital Account balances have been reduced to zero; and

     (c)   Thereafter, to the Members, *pro rata*, in accordance with their respective Percentage Interests.

### Section 6
### Federal and State Tax Matters

6.1 *Maintenance of Members' Capital Accounts*. With respect to each Member, a separate Capital Account for such Member shall be established and maintained throughout the full term of the LLC in accordance with the Code and applicable Treasury Regulations that must be complied with in order for the allocations of profits and losses provided in this Agreement to have "substantial economic effect" under applicable Treasury Regulations. Notwithstanding anything herein to the contrary, this Agreement shall not be construed as creating a deficit restoration obligation or otherwise personally obligate any Member to make a Capital Contribution in excess of the Initial Capital Contribution.

6.2 *Allocations of Profits, Losses, and Credits of the LLC*.

     (a)   *Allocation of Profits*. After giving effect to the special allocations set forth in this Section 6, Profits shall be allocated to the Members in accordance with their respective Percentage Interests.

     (b)   *Allocation of Losses*. After giving effect to the special allocations set forth in this Section 6, Losses shall be allocated to the Members in accordance with their respective Percentage Interests.

     (c)   *Regulatory Allocations*.

13

(1)     *Special Allocations*. The following special allocations shall be made in the following order:

(i)     *Minimum Gain Chargeback*. Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section 6, if there is a net decrease in LLC Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of LLC income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in LLC Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 6.2(c)(1)(i) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith. "LLC Minimum Gain" has the same meaning as the term "partnership minimum gain" set forth in Treasury Regulations Section 1.704-2(b)(2) and 1.704-2(d).

(ii)     *Member Minimum Gain Chargeback*. Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section 6, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of LLC income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 6.2(c)(1)(ii) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith. "Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" set forth in Treasury Regulations Section 1.704-2(b)(4). "Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the LLC Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

(iii)     *Qualified Income Offset*. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of LLC income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury

14

Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 6.2(c)(1)(iii) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 6 have been tentatively made as if this Section 6.2(c)(1)(iii) were not in this Agreement. "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments: (i) credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and (ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations. The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

> (iv) *Gross Income Allocation*. In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, each such Member shall be specially allocated items of LLC income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 6.2(c)(1)(iv) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 6 have been made as if Section 6.2(c)(1)(iii) hereof and this Section 6.2(c)(1)(iv) were not in this Agreement.

> (v) *Nonrecourse Deductions*. Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the Members in proportion to their respective Percentage Interests. "Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).

> (vi) *Member Nonrecourse Deductions*. Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1). "Member Nonrecourse Deductions" has the same meaning as the term "partner nonrecourse deductions" set forth in Treasury Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

> (vii) *Section 754 Adjustments*. To the extent an adjustment to the adjusted tax basis of any LLC asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Sections 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its interest in the LLC, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall

be specially allocated to the Members in accordance with their interests in the LLC in the event that Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event that Treasury Regulations Section 1.704-(b)(2)(iv)(m)(4) applies.

        (2)    *Curative Allocations.* The allocations set forth in Section 6.2(c) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of LLC income, gain, loss, or deduction pursuant to this Section 6.2(c). Therefore, notwithstanding any other provision of this Section 6 (other than the Regulatory Allocations), the Members shall make such offsetting special allocations of LLC income, gain, loss, or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all items were allocated pursuant to Section 6.2(c).

    6.3    *Tax Year and Accounting Matters.* The Fiscal Year of the LLC shall be the calendar year. The LLC shall adopt such methods of accounting and file its tax returns on the methods of accounting determined by the Members. The Members shall be responsible for all accounting matters of the LLC.

    6.4    *Tax Elections.* The Members agree that the LLC shall be taxed as a Partnership for tax purposes, and the Members shall take any and all action necessary to effectuate Partnership tax treatment. The Members, in their reasonable discretion, may cause the LLC to make or revoke all tax elections provided for under the Internal Revenue Code.

    6.5    *Tax Matters Member:* Roberts shall be the "Tax Matters Member" of the LLC, as that term is used in Subchapter C of Chapter 63 of the Code, and the Members will take such actions as may be necessary, appropriate, or convenient to effect the designation of Roberts as such Tax Matters Member. If Marc Roberts is no longer a member of the Management Committee, Roberts shall be replaced as the Tax Matters Member and Falcon shall become the Tax Matters Member. The Tax Matters Member shall have full and unlimited discretion to perform or to fail to perform any actions or to make any decisions which under the Code may be made by a Tax Matters Member. All costs of the Tax Matters Member in connection with its duties as "Tax Matters Member," including reasonable attorneys' fees, shall be the obligation of and shall be paid or reimbursed by the LLC.

**Section 7**
**Termination and Dissolution of the LLC**

    7.1    *Events of Dissolution.* The LLC shall be dissolved upon the occurrence of any of the following events:

        (a)    The unanimous determination of the Members;

16

(b)    The sale, transfer, or assignment of substantially all of the assets of the LLC;

(c)    As otherwise required by law.

7.2    *Conclusion of Affairs*. In the event of the dissolution of the LLC for any reason, the Members shall deliver articles of dissolution to the Department of State for filing, and shall proceed promptly to wind up the affairs of and liquidate the assets of the LLC.  Except as otherwise provided in this Agreement, the Members shall continue to share distributions and tax allocations during the period of liquidation in the same manner as before the dissolution.

7.3    *Liquidating Distributions*. After paying or providing for the payment of all claims, debts or liabilities and obligations of the LLC and all expenses of liquidation, the proceeds of the liquidation and any other assets of the LLC shall be distributed to or for the benefit of the Members in accordance with Section 5.2 of this Agreement.

7.4    *Termination*. Upon completion of the liquidation of the LLC and the distribution of all LLC assets, the LLC shall terminate and the Members shall have the authority to execute and record Articles of Dissolution of the LLC, as well as any and all other documents required to effectuate the dissolution and termination of the LLC.

## Section 8
## Transfers of Membership Units

8.1    *Restrictions on Transfers*.   No Member may Transfer (as defined below) its Interests in whole or in part without the consent of all of the other Members.   For purposes of this Agreement, the term "Transfer" or "Transferred" shall mean the sale, assignment, transfer, pledge, encumbrance, or other disposition, by operation of law or otherwise, of Interests.  A Transfer shall also include the transfer of a beneficial ownership interest in a Member, except that a beneficial ownership interest in Falcon may be transferred if Arthur J. Falcone, Edward W. Falcone and Robert J. Falcone, collectively, or Arthur J. Falcone alone remain in voting control and the beneficial ownership interest in Roberts may be transferred if Marc Roberts and Harvey Silverman or Marc Roberts alone remain in voting control.   Notwithstanding the foregoing, a Member may make a Transfer and the beneficial ownership interest of a Member may be transferred to: (i) any person who is a personal representative (a person who succeeds to an estate as a result of a decedent's death or legal incompetence) of a Member or individual member of a Member and (ii) the immediate family of a Member or a member of a Member (consisting of the spouse, children, brothers, sisters and natural or adopted lineal ancestors or descendants, and trusts for the exclusive benefit of them) in a transfer solely for estate planning purposes.

(a)    Any permitted Transfer of Membership Units shall be effective only to give the person to whom Transferred (the "Transferee") the right to receive the share of tax allocations and distributions to which the person transferring (the "Transferor") would otherwise be entitled. Except as otherwise provided herein, no Transferee of Membership Units shall have

17

the right to become a substituted Member unless the Member(s) owning the remaining Membership Units, in the exercise of its or their sole and absolute discretion, expressly consents thereto in writing and the Transferee agrees to be bound by all the terms and conditions of this Agreement as then in effect. Unless and until a Transferee is admitted as a substituted Member, the Transferee shall have no right to exercise any of the powers, rights, and privileges of a Member hereunder.

      (b)     Any Transfer not in accord with this Section 8 shall be void *ab initio*.

    8.2    *Repayment of Outstanding Loans of Members*. Notwithstanding any other provision of this Section 8, no Member may Transfer its Interests to a third party, and neither the LLC nor any Member may elect to purchase the Interests of another Member, unless such Member agrees to pay, in cash at the time of closing of such transaction, any and all outstanding loans, debts, and obligations owed by such Member to the LLC.

    8.3    <u>*Buy-Sell Option*</u>.

      (a)     In the event a "Deadlock Impasse" is declared under Section 3.10(d) by Falcon or Roberts, either Falcon or Roberts (and/or one or more of its Affiliates) (the "Offeror") shall have a right to purchase the entire Interest of the other of such Members (a "Purchase") for the Purchase Price (defined below). To initiate a Purchase, the Offeror shall deliver a written notice (the "Offeror Notice") to the other Member within thirty (30) days after a Deadlock Impasse is declared (in accordance with the "notice" provisions of this Agreement) that it desires to purchase the entire Interest of such other Member.  The "Purchase Price" payable to the Member selling its Interest shall be equal to the amount that the Member would receive from the LLC in the event of a hypothetical sale of the assets of the LLC in a single cash transaction at the Fair Market Value (as defined below) followed by a hypothetical liquidation of the LLC, and distribution of net proceeds to the Members in accordance with Section 5.2 determined as follows:

        (i)     First, there shall be a determination of the fair market value of the assets of the LLC, determined in the manner set forth in this subsection 8.3(a)(i) ("Fair Market Value").  The Fair Market Value shall be determined as of the date of the Offer Notice by an MIA certified appraiser qualified to make a determination of value of property in Miami-Dade County similar in use to the Property, who is mutually acceptable to Falcon and Roberts.  In the event that Falcon and Roberts are unable to agree upon the appraiser within thirty (30) days of the delivery of the Offer Notice, then each of them shall select an appraiser and the Fair Market Value shall be the average of the two appraisals.  However, if the higher of the two appraised values determined by the appraisers is more than ten percent (10%) greater than the lower of the two appraised values, then the two appraisers shall select a third similarly qualified appraiser, and in this event, the Fair Market Value shall be the average of the third appraisal and the one closest to it.  The cost of the third appraisal shall be shared equally between the parties;

        (ii)     Second, the "Purchase Price" shall be the amount the Offeree would receive in the hypothetical liquidation of the LLC, pursuant to a liquidating

18

distribution in accordance with Section 5.2 after the LLC receives the proceeds from the cash sale of its assets for their Fair Market Value followed by the payment of all LLC indebtedness, liabilities and claims and the winding up of its business and affairs; and

(iii)     Third, in determining the hypothetical valuations in the preceding subsections, there shall be no minority or marketability discount or any other discount used.

(b)     The other of such Members (the "Offeree") shall then be obligated to elect and agree either:

(i)     to purchase (either alone or along with one or more of its Affiliates), the entire Interest of the Offeror for the Purchase Price; or

(ii)     to sell to the Offeror the entire Interest of the Offeree for the Purchase Price.

The Offeree shall give written notice of such election to the Offeror no later than thirty (30) days after the determination of the Fair Market Value.  If the Offeree fails to give the Offeror notice of a response within such 30-day period, the Offeree shall be conclusively deemed to have elected to sell its Interest pursuant to clause (ii) above.

(c)     The closing of the purchase pursuant to this Section 8.3 shall be held at a mutually acceptable place on a mutually acceptable date no later than one hundred and twenty (120) days after the determination of the Fair Market Value of the assets of the LLC. At such closing the selling Member shall assign to the purchasing Member its entire Interest, free and clear of all liens and encumbrances other than for LLC indebtedness, and shall execute all other documents as may be reasonably necessary or advisable to effectuate the transaction contemplated hereby, and the purchaser shall pay the Purchase Price therefor in cash, by a cashier's or certified check from a nationally recognized bank or by wire transfer. All closing costs shall be borne by the parties equally.

(d)     At or before the closing of a purchase (and as a condition thereof): (i) any outstanding loans or advances of the selling Member to the LLC shall be discharged by the LLC or the purchasing Member; (ii) the purchasing Member shall assume all of the guaranty obligations of the selling Member or its principals, as the case may be, regarding any LLC indebtedness; and (iii) the purchasing Member shall provide releases for all such guaranty obligations to the selling Member or its principals, as the case may be, provided, however, if releases cannot be obtained from the third party(ies) holding the rights to such guaranty obligations, after best efforts by the purchasing Member to obtain same, then the purchasing Member, the Affiliate of the Member if such Affiliate is the purchaser and Arthur J. Falcone, if Roberts is the selling Member, or Marc Roberts, if Falcon is the selling Member, shall provide the selling Member with an indemnification against liability and expenses under such guaranty obligations and such other reasonable assurances as the selling Member may reasonably request.

19

**Section 9**
**Administrative Provisions**

9.1 *Principal Office.*

  (a) The initial principal place of business and principal office of the LLC shall be 5119 Artesa Way West, Palm Beach Gardens, Florida 33418.  The LLC may relocate the principal office and principal place of business and have such additional offices as the Management Committee may deem advisable.

  (b) The Management Committee shall have the power, on behalf of the LLC, to designate, where required, a registered agent (or other agent for receipt of service of process) in each state or other jurisdiction in which the LLC transacts business and to designate, to the extent required, an office, place of business, or mailing address within or without that state of other jurisdiction.

9.2 *Bank Accounts; Signature Authority.* Funds of the LLC shall be deposited in an account or accounts of any bank(s) or other financial institution(s) which are participants in federal insurance programs selected by the Members. The Management Committee shall arrange for the appropriate conduct of such accounts. The Management Committee shall have authority to designate and revoke the authority for check signing.

9.3 *Books and Records.* At all times during the term of the LLC, the Members shall keep, or cause to be kept, full and faithful books of account, records, and supporting documents, which shall reflect, completely, accurately, and in reasonable detail, each transaction of the LLC (including, without limitation, transactions with the Members or Affiliates of Members). The books of account shall be maintained and tax returns prepared and filed in accordance with the method of accounting determined by the Members. The cost for preparation of all state and federal tax returns shall be borne by the LLC. The books of account, records, and all documents and other writings of the LLC shall be kept and maintained either at the principal office of the LLC or at the principal office of the Management Committee, as the Members shall determine. Each Member or its designated representative shall, upon reasonable notice to the Management Committee, have access to such financial books, records, and documents during reasonable business hours and may inspect and make copies of any of them at its own expense. Upon the written request of the Members, the Managers shall have audited financial statements prepared at the cost of the LLC. The Members shall cause the LLC to keep at its principal office the following:

  (a) A current list of the full name and last known business address of each Member, in alphabetical order;

  (b) A copy of the Articles of Organization and all Articles of Amendment thereto;

  (c) Copies of the LLC's federal, state, and local income tax returns and reports, if any, for the three most recent years;

20

(d)      Copies of this Agreement, and all amendments thereto; and

(e)      Any other information or records required by the Act.

## Section 10
## Indemnification

10.1    *Indemnification of Organizer, Members, and members of the Management Committee.*

(a)      To the greatest extent not inconsistent with the laws and public policies of Florida, the LLC shall have the obligation to indemnify any Organizer, Member or member of the Management Committee (any such Organizer, Member, or member of the Management Committee, and any responsible officers, partners, shareholders, directors, or managers or persons authorized to act on behalf of such Organizer, Member, or member of the Management Committee which is an entity, are hereinafter being referred to as the "Indemnified Party") made a party to any proceeding because such Indemnified Party is or was an Organizer, Member or member of the Management Committee, against all liability incurred by such Indemnified Party in connection with any proceeding; provided, however, that it shall be determined in the specific case, in accordance with subsection (d) of this Section 10.1, that indemnification of such Indemnified Party is permissible in the circumstances because the Indemnified Party has met the standard of conduct for indemnification set forth in subsection (c) of this Section 10.1. If such indemnification is permissible under the provisions of this Section 10.1, the LLC shall pay for or reimburse the reasonable expenses incurred by the Indemnified Party in connection with any such proceeding in advance of final disposition thereof, if:

(1)      the Indemnified Party furnishes the LLC a written affirmation of the Indemnified Party's good faith belief that it has met the standard of conduct for indemnification described in subsection (c) of this Section 10.1;

(2)      the Indemnified Party furnishes the LLC a written undertaking, executed personally or on such Indemnified Party's behalf, to repay the advance if it is ultimately determined that such Indemnified Party did not meet such standard of conduct; and

(3)      a determination is made in accordance with subsection (d) that, based upon facts then known to those making the determination, indemnification would not be precluded under this Section 10.1.

The undertaking described in subsection (a)(2) above must be a general obligation of the Indemnified Party, subject to such reasonable limitations as the LLC may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The LLC shall have the obligation to indemnify an Indemnified Party who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, against reasonable expenses incurred by the Indemnified Party in connection with the proceeding, without the requirement of a

determination as set forth in subsection (c) of this Section 10.1. Upon request by an Indemnified Party for indemnification or advancement of expenses, as the case may be, the LLC shall expeditiously determine whether the Indemnified Party is entitled thereto in accordance with this Section 10.1. The indemnification and advancement of expenses provided for under this Section 10.1 shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section 10.1.

(b)     The LLC shall have the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the LLC to the same extent as if such individual was an Organizer, Member or member of the Management Committee.

(c)     Indemnification of an Indemnified Party is permissible under this Section 10 only if:

(1)     he conducted himself in good faith;

(2)     he reasonably believed that the conduct was in or at least not opposed to the LLC's best interest;

(3)     in the case of any criminal proceeding, he had no reasonable cause to believe that the conduct was unlawful; and

(4)     he is not adjudged in any such proceeding to be liable for gross negligence, bad faith or misconduct in the performance of duty. The termination of a proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent is not, of itself, determinative that the Indemnified Party did not meet the standard of conduct described in this subsection (c) of this Section 10.1.

(d)     A determination as to whether indemnification or advancement of expenses is permissible shall be made by either of the following procedures:

(1)     A vote of the Members consisting of Members not at the time parties to the proceeding; or

(2)     By special legal counsel as selected and approved by the Members.

(e)     Nothing contained in this Section 10 shall omit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to the indemnification of or advancement of expenses to any Indemnified Party who is or was an Organizer, Member, or Manager of the LLC or is or was serving at the LLC's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic LLC, partnership, association, limited liability LLC, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for-profit or not. Nothing contained in this Section 10 shall limit the ability of the LLC to otherwise indemnify or advance expenses to any individual. It is the intent of this Section 10 to authorize indemnification of and advancement of expenses to

22

an Organizer, Member, or Manager to the fullest extent now or hereafter permitted by the law and consistent with the terms and conditions of this Section 10. Indemnification may be provided in accordance with this Section 10 irrespective of the nature of the legal or equitable theory upon which a claim is made, including, without limitation, negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(f)     For purposes of this Section 10:

(1)     The term "expenses" includes all direct and indirect costs (including, without limitation, counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement, or appeal of a proceeding.

(2)     The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to any employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(3)     The term "party" includes an Individual who was, is, or is threatened to be made a named defendant or respondent in a proceeding.

(4)     The term "proceeding" means any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal.

(g)     The LLC may purchase and maintain insurance for its benefit, the benefit of any individual who is eligible for indemnification under this Section 10, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the LLC, whether or not the LLC would have the power to indemnify such individual against such liability.

**Section 11**
**Representations and Warranties**

11.1     *Representations and Warranties of Members*. Each Member represents and warrants to each other Member as follows:

(a)     Such Member is an entity in good standing and organized under the laws of its state of organization and its status is active; and

(b)     Such Member has the requisite authority to enter into this Agreement and to incur and perform its obligations under this Agreement. The execution, delivery, and performance by such Member of this Agreement has been authorized by all necessary action.

23

Upon the execution and delivery of this Agreement, this Agreement shall constitute a valid and binding agreement of such Member, enforceable against such Member in accordance with its terms, subject only to applicable bankruptcy, moratorium and similar laws.

**Section 12**
**Miscellaneous Provisions**
**Defined Terms**

*Defined Terms.* The defined terms used in this Agreement shall have the meanings specified below or in the Section in which they first appear.

*Act* shall mean the Florida Limited Liability Company Act, as amended, Florida Statutes Code §§ 608.401 to 608.514, or any corresponding provision or provisions of succeeding law.

*Affiliate* with respect to any specified Person shall mean (i) any Person directly or indirectly controlling or under common control with the specified Person; (ii) any director, officer, partner, or trustee of the specified Person; (iii) any Person directly, indirectly, or beneficially owning or controlling 20% or more of any class of voting securities of, or otherwise having a substantial beneficial interest in, the specified Person; and (iv) any ancestor, spouse, or family member, whether by blood or marriage, of the specified Person, or any trust for the primary benefit of such persons.

*Agreement,* means this Operating Agreement and all Schedules attached hereto and by this reference made a part hereof and as amended, restated or supplemented from time to time

*Articles of Organization* means the Articles of Organization of the LLC filed October 3, 2007,  with the Secretary of State of the State of Florida pursuant to the Florida Limited Liability LLC Act, as such Articles of Organization may be amended or restated from time to time.

*Bankruptcy of a Member* means (a) the Member's filing of a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of his or her debts under Title 11 of the United States Code (or corresponding provisions of future laws) or any other federal or state insolvency law, or a Member's filing an answer consenting to or acquiescing in any such petition, (b) the Member's making of any assignment for the benefit of his creditors or the Member's admission in writing of his or her inability to pay his or her debts as they mature, or  (c) the expiration of 60 days after the filing of an involuntary petition under Title 11 of the United  States Code (or corresponding provisions of future laws), seeking an application for the appointment of a receiver for the Member's assets, or an involuntary petition seeking liquidation, reorganization, arrangement or readjustment of his or her debts under any other federal or state insolvency law, provided that the petition or application has not been vacated, set aside or stayed within the 60-day period.

*Business Day,* means Monday through Friday of each week, except that a legal holiday recognized by the government of the United States or the State of Florida will not be regarded as a Business Day.

*Capital Account* means, with respect to any Member, the Capital Account established, maintained, and adjusted for such Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv) or other applicable provisions of the Code and Treasury Regulations promulgated thereunder.

*Code* shall mean the Internal Revenue Code of 1986, as amended, or any corresponding provision or provisions of succeeding law.

*Fiscal Year* means the fiscal year of the LLC as set forth in Section 6.3.

*Interest* means the entire membership interest owned by Members in the LLC, including the right of such Members to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligation of such Member to comply with all the terms and provisions of this Agreement.

*LLC* shall mean the limited liability company formed pursuant to the Articles of Organization and this Agreement by the parties hereto, as said limited liability company may from time to time be constituted.

*Management Committee* shall have the meaning set forth in Section 3 of this Agreement.

*Majority of the Members* shall mean a simple majority (i.e., more than one half) of the Percentage Interests of the LLC.

*Member(s)* shall mean any member of the LLC that becomes a member of the LLC in accordance with this Agreement.

*Percentage Interest(s)* shall mean a Member's percentage of the aggregate Interests of the LLC as set forth on <u>Schedule A</u>.

*Person* shall mean any individual, partnership, corporation, association, trust, limited liability LLC, or other legal entity, whether foreign or domestic, and its heirs, executors, administrators, legal representative, successors, and assigns where the context requires.

*Profits and Losses* for each Fiscal Year or other period shall mean an amount equal to the LLC's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), but computed with the following adjustments: (i) Any income of the LLC that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of Profits and Losses shall be added to such taxable income or loss; (ii) Any expenditures of the LLC described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits and Losses pursuant to this definition, shall be

25

subtracted from such taxable income or loss; and (iii) Notwithstanding any other provisions herein, any items of income, gain, loss, or deduction specially allocated pursuant to Section 6.2(c) hereof shall not be taken into account in computing Profits and Losses.

*Treasury Regulations* shall mean the regulations of the United States Treasury Department pertaining to income tax, as amended, and any successor provision thereto.

## Section 13
## Miscellaneous Provisions

13.1    *Governing Law; Waiver of Jury Trial.* This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of Florida, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws. The parties hereto agree to submit to the jurisdiction of the federal or state courts sitting in Palm Beach County, Florida in connection with any claims or controversy arising out of this Agreement and stipulate that venue for such actions shall be solely in Palm Beach County, Florida. The parties waive any right to move the venue to any other location, whether for convenience of the parties or otherwise. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THAT ANY PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THE PROJECT, THIS AGREEMENT OR ANY OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH, OR IN RESPECT OF ANY COURSE OF CONDUCT, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR EACH OF THE PARTIES TO ENTER INTO THIS TRANSACTION.

13.2    *Attorneys Fees*. If any party incurs any costs and/or attorneys' fees with respect to the enforcement of this Agreement against the other party(ies) (whether in connection with arbitration, judicial proceedings or other legal action, including costs and/or fees incurred on appeal), the successful party shall be entitled to recover from the other all such costs and fees, provided that attorneys' fees and other professional fees shall be reasonable.

13.3    *Entire Agreement*. This Agreement, including the Schedules or other documents or schedules attached hereto or incorporated herein by reference constitutes the entire agreement of the Members with respect to the LLC. This Agreement supersedes all prior agreements and oral understandings between the Members with respect to such matters.

13.4    *Amendment*. Except as provided by law or otherwise set forth herein, this Agreement may only be modified or amended by a written instrument which evidences the Approval of Members. *Schedule A* hereto may be amended from time to time by the Members to the extent required to accurately reflect the then current status of the information contained thereon.

13.5    *Interpretation*. Whenever the context may require, any noun or pronoun used herein shall include the corresponding masculine, feminine, or neuter forms. The singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

13.6    *Severability*. Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions hereof are determined to be invalid and contrary to existing or future law, such invalidity shall not impair the operation or affect those portions of this Agreement which are valid, and this Agreement shall remain in full force and effect and shall be construed and enforced in all respects as if such invalid or unenforceable provision or provisions had been omitted.

13.7    *Burden and Benefit upon Successors*. Except as expressly otherwise provided herein, this Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal, and legal representatives, successors, and assigns.

13.8    *Further Assurances*. Each Member hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information, and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

13.9    *Notices*. All notices required or permitted to be given hereunder shall be in writing and shall be either hand-delivered, sent by recognized overnight delivery service, by facsimile, or sent by U.S. mail (registered or certified, return receipt requested) as follows:

(a)    To the Members at the addresses of the respective Members as set forth on *Schedule A*, or to such other address as any Member may designate by giving written notice to the LLC in accordance with this Section 13.9.  Notice shall be deemed to be effective upon delivery; and

(b)    If to the LLC, to the office of the LLC.

(c)    For purposes of this Section 13.9, notice shall be deemed effective as follows:

(1)    Items sent by a recognized overnight delivery service for next-day morning delivery shall be deemed delivered by noon of the following day;

(2)    Items sent by facsimile shall be deemed delivered at the time transmitted provided that such fax is accompanied or preceded by a telephone conversation with the recipient alerting the recipient of the fax; and

(3)    Items sent by certified or registered mail shall be deemed delivered five (5) days after deposit in the United States mail, postage prepaid.

13.10   *Waiver*.   No consent or waiver, express or implied, by any party hereto of any breach or default by any other party hereto in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such party of the same or any other obligations of such party hereunder. Failure on the part of any party to complain of any act or failure to act of another party or to declare another party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

13.11   *LLC Property*.   All legal title to LLC Property shall be held in the name of the LLC.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

> HARCONE 44B LLC,
> a Florida limited liability company
>
> By:   MR 44 MGR LLC,
>       a Florida limited liability company
>       Its: Manager
>
>       By: _____
>           Marc Roberts, Manager
>
>
> FALCON PARK WEST LLC,
> a Florida limited liability company
>
> By: _____
>     Arthur J. Falcone, Manager

H:\09Admin\JW\NCS\DOperatingAgreementHarcone44JW/rrlc-bch

29

Harum 44



## Schedule A

_____

### SCHEDULE OF MEMBERS, CAPITAL CONTRIBUTIONS,
### AND MEMBERSHIP UNITS

| Member Name | Address | Initial Capital Contribution | Percentage Interests |
|---|---|---|---|
| HARCONE 44B LLC | | $_____0_____ | 50% |
| Falcon Park West LLC | 1951 NW 19th Street Suite 200 Boca Raton, Fl. 33431 | $_____0_____ | 50% |
| Total | | $_____0_____ | 100% |

30